**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TANYA MCCARTNEY** and **MARK MONTGOMERY III**, Individually and as Administrators of the **ESTATE OF KAIDON A. MONTGOMERY**,<br><br>        Plaintiffs,<br><br>    vs.<br><br>**KIDS 2, INC. f/k/a KIDS II, INC.**; and **KIDS 2, INC. d/b/a, t/a, a/k/a INGENUITY**,<br><br>        Defendant. | Civil Action No.: 3:21-CV-166<br><br><br>**KIDS 2, INC.'S MOTION FOR SANCTIONS** |

Kids2 hereby moves this Court for sanctions in connection with Plaintiffs' counsel's improper conduct at the expert depositions of its experts Mr. Glancey, Ms. Mannen, and Drs. Rosen and Ross. Kids2 requests oral argument on this Motion.

<u>**INTRODUCTION**</u>

Kids2 seeks sanctions for the obstreperous and improper conduct of Plaintiffs' counsel, Tom Bosworth, during the depositions of Plaintiffs' experts. Throughout the depositions of Mannen, Ross, Rosen, and Glancey, Bosworth interposed an astounding number of improper objections—over 150 by Kids2's count—including more than two dozen instances in which he instructed the experts not to answer questions without any recognized legal basis for doing so. Bosworth's objections were frequently lengthy and clearly intended to influence the witness's testimony or shut down reasonable lines of inquiry. They were also expressed in discourteous, uncivil terms and far too often infused with personal insults directed at Kids2's counsel. In violation of the Federal Rules and any reasonable standard of decorum, Bosworth's behavior impeded the fair examination of Plaintiffs' experts and prejudiced Kids2's preparation for trial. Given Bosworth's repeated and significant infractions, Kids2 is entitled to sanctions, and it proposes a series of tailored sanctions below, including costs and fees for bringing this motion,

costs and fees for attending expert depositions, limits on the experts' opinions, and/or stipulations as to certain issues about which Bosworth obstructed fair examination of his witnesses.

## **BACKGROUND**

While Kids2 is specifically seeking redress for Mr. Bosworth's improper conduct in defending his clients' expert depositions, it is important to understand that his deposition conduct was the peak of a crescendo of unprofessional behavior. Plaintiffs initiated this case on September 17, 2021, and from the start, Mr. Bosworth proved dilatory and difficult. Among counsel's improper actions include not confirming the subject product's manufacturer and model number until four months after requested, neglecting to notice any depositions until thirteen working days prior to the fact discovery deadline, failing to have his clients present (even virtually) at the Court-ordered mediation, altering the coroner records to remove detrimental pages before producing them to Kids2, and only producing a signed medical authorization after discovery had closed. This recounting of unprofessional, dilatory, obstructionist behavior is far from exhaustive; even the most routine tasks in this case required multiple requests of Mr. Bosworth, at the unnecessary and considerable expense of Kids2.

Throughout the depositions of Plaintiffs' experts, Bosworth repeatedly exhibited blatant disregard for Rule 30 of the Federal Rules of Civil Procedure, the rules of professional conduct, and basic decency. His sanctionable conduct is categorized and described in detail below, but in general, Bosworth repeatedly instructed witnesses not to answer questions, critiqued Kids2's counsel's questions in ways that influenced the testimony, and frequently resorted to childish invective, referring to Kids2 or its counsel as "stupid," "schills," and "liars." (Ex. C (Glancey Tr.) pp. 81:10–82:10; 272:20–275:11; 264:3–15.) Bosworth's conduct during plaintiffs' expert

depositions became so abhorrent that Kids2 ultimately suspended the deposition of Dr. Glancey to seek Court intervention with its November 18 letter, attached as Exhibit A. For ease of reference, Kids2 prepared a compilation of Bosworth's deposition antics, which is attached as Exhibit B.[1] The relevant deposition transcripts are attached as Exhibits C–F, and Kids2 will also be happy to provide the Court with videotaped recordings.

## RELEVANT LAW

**A. The Federal Rules require the counsel assert deposition objections concisely and in a manner that is neither argumentative nor suggestive.**

Rule 30 of the Federal Rules of Civil Procedure "vest[s] the court with broad authority and discretion to control discovery, including the conduct of depositions." *Hall v. Clifton Precision, a Div. Of Litton Sys., Inc.*, 150 F.R.D. 525, 527 (E.D. Pa. 1993). Under this rule, the "examination and cross-examination of a deponent proceed as they would at trial," and while objections are permitted, they must "be stated concisely in a nonargumentative and nonsuggestive manner." Fed. R. Civ. P. 30(c)(1) and (2). Counsel may "instruct a deponent not to answer ***only*** when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." *Id.* (emphasis added).

Applying these rules, courts have cautioned litigants time and again that so-called "speaking objections" are impermissible and obstructive. As noted in *Hall v. Clifton Precision, a Div. Of Litton Sys., Inc.*:

> The Federal Rules of Evidence contain no provision allowing lawyers to interrupt the trial testimony of a witness to make a statement. Such behavior should likewise be prohibited at depositions, since it tends to obstruct the taking of the witness's testimony. It should go without saying that lawyers are strictly

---

[1] Kids2 has filed a Motion for Leave to File Exhibits Under Seal (ECF No. 67) seeking to file Exhibits B through F to this Motion under seal. These Exhibits will be promptly filed with the Court upon a ruling on that Motion.

> prohibited from making any comments, either on or off the record, which might suggest or limit a witness's answer to an unobjectionable question.

150 F.R.D. 525, 530–31 (E.D. Pa. 1993).

Courts have likewise counseled litigants against verbose or argumentative objections that impede efficient examination. As Magistrate Judge Dodge put it recently, depositions are meant to be fact-uncovering question-and-answer sessions, but when "a deposition becomes something other than that because of the strategic interruptions, suggestions, statements, and arguments of counsel, it not only becomes unnecessarily long, but it ceases to serve the purpose of the Federal Rules of Civil Procedure: to find and fix the truth." *Animal Legal Defense Fund v. Lucas*, 2020 WL 7027609, *2 (W.D. Pa. 2020).

Courts in this District affirm and enforce the deposition standards expressed in *Hall v. Clifton Precision, a Div. of Litton Sys., Inc.*, 150 F.R.D. 525 (E.D. Pa. 1993). *See Peronis v. United States*, 2017 WL 696132, at *1 (W.D. Pa. Feb. 17, 2017) (stating that *Hall* "provides the standard for attorney conduct during depositions). Among various rules and guidelines, the court in *Hall* explained that attorneys who are defending witnesses at depositions must refrain from:

(1)   Clarifying questions for the witness;
(2)   Assisting the witness in answering questions, through testimony or comments which might suggest or limit a witness's answer to an unobjectionable question;
(3)   Deciding which questions the witness should answer; and
(4)   Not stating proper objections "pithily."

*Id.*

## B. The Federal Rules authorize courts to impose sanctions when counsel misuse the objection-making process to prevent a fair examination.

Under Rule 30(d)(2), a "court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30. Argumentative

objections, suggestive objections, and unfounded instructions not to answer indisputably impede, delay, and frustrate the deposition process. *See* Fed. R. Civ. P. 30(d)(2), advisory committee notes (1993 amendments) (noting the deleterious effects of such conduct). Even if concisely and neutrally stated, "an excessive number of unnecessary objections may itself constitute sanctionable conduct." *Id.*

Rule 30(d)(2) does not limit the types of sanctions available; it only requires that the sanctions be "appropriate." *See Francisco v. Verizon S., Inc.,* 756 F.Supp.2d 705, 712 (E.D.Va.2010), *aff'd,* 442 F. Appx. 752 (4th Cir. 2011) ("Although Rule 30(d)(2) does not define the phrase 'appropriate sanction,' the imposition of discovery sanctions is generally within the sound discretion of the trial court." (citations omitted)).

District courts also have a "'well-acknowledged' inherent power . . . to levy sanctions in response to abusive litigation practices." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980). "A primary aspect of that [power] is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). "[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id.* at 49. Whether a district court wields its sanction powers under the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, or its inherent power, it does so at its "broad discretion." *Topalian v. Ehrman*, 3 F.3d 931, 934 (5th Cir. 1993).

Here, as explained below, Kids2 requests sanctions tailored to the specific misconduct at issue and the resulting harms, and the sanctions Kids2 seeks are consistent with curative relief courts have granted in other cases for similar infractions. *See, e.g.*, *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 197 (E.D. Pa. 2008) (awarding monetary sanctions for the time and expense related to both depositions and a related motion for counsel's misconduct at deposition

instructing a witness not to answer); *Riverside Mem'l Mausoleum, Inc. v. Sonnenblick-Goldman Corp.*, 80 F.R.D. 433, 437 (E.D. Pa. 1978) (granting preclusion sanctions for discovery misconduct); *Tacori Enters. v. Beverlly Jewellery Co.*, 253 F.R.D. 577, 584 (C.D. Cal. 2008) (imposing sanctions limiting evidence/testimony on certain topics following a party's willful deposition misconduct).

## **ARGUMENT**

During the depositions of Plaintiffs' experts, attorney Bosworth routinely engaged in precisely the obstreperous and suggestive behavior the rules and case law proscribe. Bosworth thereby thwarted the fair examination of those experts, and his misconduct warrants the curative sanctions outlined below.

### I.   **Bosworth improperly instructed his witnesses not to answer.**

It is black-letter law that an attorney may not instruct a witness not to answer a question for any reason other than to preserve a privilege, enforce a court-ordered limitation, or present a Rule 30(d)(3) motion. Fed. R. Civ. P. 30(c)(2). The "fact that a question is repetitive or irrelevant is not an appropriate ground for instructing a witness not to answer a question." *Hearst/ABC-Viacom Entm't Servs. v. Goodway Mktg., Inc.*, 145 F.R.D. 59, 63 (E.D. Pa. 1992). Yet throughout the depositions of Plaintiffs' experts, Bosworth improperly instructed the witnesses not to answer more than thirty times based purely on his belief the questions did not warrant answering or his inaccurate assertion that the expert had already answered the questions.[2]

For instance, at Dr. Ross's deposition, Bosworth objected to a question by disputing it, summarizing the witness's prior testimony, and ultimately instructing the witness not to answer:

---

[2] Bosworth improperly instructed the experts not to answer 32 times collectively by Kids2's count. *See generally*, Exhibit B (listing examples of Bosworth improperly instructing each expert witness not to answer).

MS. BULLARD: But your testimony is now that you're -- you've concluded Kaidon was in the bouncer as a result of the mom's recanted statement or changed statement to the coroner; is that right?

MR. BOSWORTH: That's not what he said. He said -- he gave you the -- and he's not answering it again. He gave you the basis for his opinion that the child was in the bouncer, and it didn't include just the mom's statement. It included a host of other factors. Next question. Next question please. Let's move this along.

Ex. F (Ross Tr.) pp. 75:10–76:4.

Similarly, during the deposition of Dr. Glancey, Bosworth repeatedly instructed the witness not to answer basic questions on the grounds that the question had been asked previously:

MS. BASSIN: Now I understand you that you're not calling this an incline sleeper, but you believe that it is a bouncer that has an incline to which can kids could fall asleep; fair statement?

MR. BOSWORTH: I'm gonna object. It's been asked and answered. It's harassing. Under Rule 30, he's not gonna answer it for those reasons. Next question.

MS. BASSIN: Is that a fair statement, Dr. Glancey?

THE WITNESS: I was --

MR. BOSWORTH: Hold on.

THE WITNESS: I was instructed not to answer.

MR. BOSWORTH: Yeah. Harassing. Harassing. Next question.

Ex. C (Glancey Tr.) pp. 150:19–153:9.[3]

Perhaps most egregiously, at the deposition of Dr. Rosen, Bosworth—thinking his witness had given favorable testimony related to warnings—refused to allow Kids2 counsel to clarify that Dr. Rosen did not, in fact, intend to offer warnings opinions:

MS. BASSIN: Okay. All right. All right. And it's not your intent to offer testimony about warnings, correct?

MR. BOSWORTH: I'm going to object to that --

MS. BASSIN: Since you're not a warnings expert.

MR. BOSWORTH: -- on the same basis as you've stepped in it, Alana, as my grandfather used to say. Like, you can't -- you can't -- you can't take back what just happened.

MS. BASSIN: Tom, I'm not taking back anything.

---

[3] The question had not, in fact, been previously asked or answered.

> MR. BOSWORTH: Yeah, you did. You went somewhere --
> MS. BASSIN: I'm not taking back anything. I don't think I stepped in it at all.
> MR. BOSWORTH: You went somewhere and you got slapped in the face theoretically. And I'm sorry that that hurt, but that's his testimony. He's going to offer opinions based on what he said in this deposition that you have noticed and what's fairly within the scope of his report, as per the judge's instructions. So he's not going to answer that question, but you can ask another one if you'd like.

Ex. E (Rosen Tr.) p. 248:14–24.

In no instance did Bosworth even attempt to assert a recognized ground for instructing a witness not to answer. His patently inappropriate instructions prevented Kids2 from fully exploring Plaintiffs' experts' opinions in advance of trial. *See, e.g.*, Ex. D (Mannen Tr.) pp. 196:16–197:25 (counsel instructing expert Mannen not to answer whether she is "offering an expert opinion as to where Kaidon died"). And such conduct is sanctionable. *Plaisted*, 210 F.R.D at 535 ("counsel acted improperly under . . . *Hall* and [ ] Rule 30 when, during four separate depositions, she made repeated objections, instructed witnesses not to answer certain questions").

## II.  Bosworth blatantly coached his witnesses.

As noted, the Federal Rules flatly prohibit objections intended to help the witness understand the question or answer in a particular way. Under *Hall*, the witness is to interpret the question unaided, and only the witness may ask for clarification of purportedly unclear questions:

> If the witness needs clarification, the witness may ask the deposing lawyer for clarification. A lawyer's purported lack of understanding is not a proper reason to interrupt a deposition. in addition, counsel are not permitted to state on the record their interpretations of questions, since those interpretations are irrelevant and often suggestive of a particularly desired answer.

*Hall*, 150 F.R.D. at 530 n. 10; *accord* Peter M. Panken & Mirande Valbrune, *Enforcing the Prohibitions Against Coaching Deposition Witnesses,* Prac. Litig., Sept. 2006, at 15, 16 ("It is improper for an attorney to interpret that the witness does not understand a question because the lawyer doesn't understand a question. And the lawyer certainly shouldn't suggest a response. If

the witness needs clarification, the witness may ask the deposing lawyer for clarification. A lawyer's purported lack of understanding is not a proper reason to interrupt a deposition.").

Despite the Federal Rules' prohibition on witness coaching, Bosworth repeatedly interjected with comments intended to help the witness answer the question.[4] Instead of the question-and-answer session to which it was entitled, Kids2 got a three-way conversation in which Bosworth commented on the questions, offered interpretations or criticisms of the questions, and guided the witnesses how to answer. Counsel acted as an intermediary, frustrating the purpose of case-critical expert depositions.

For example, during the deposition of Dr. Ross, Bosworth coached the witness as to what evidence formed the basis of one of his expert opinions:

> MS. BULLARD: Okay. So, other than being able to see an image of blood on the bouncer seat, is there any other sort of basis for your opinion that the blood shown there isn't from somewhere else?
> MR. BOSWORTH: Object to form, misstates testimony. He said he saw it in the photographs. You're assuming he's referring to the product as opposed to the dead child. I don't know that he was referring only to the product photos –
> MS. BULLARD: Tom, stop.
> MR. BOSWORTH: But also the dead child. So your question contains a fallacy.

Ex. F (Ross Tr.) pp. 32:9–33:7.[5]

On another occasion during Dr. Ross's deposition, Bosworth objected to a question and then rephrased it in a manner that prompted the witness how to answer:

> MS. BULLARD: Q. Jumping around a little here. I just am not sure I understood or got the question out. I'm talking about the pain and suffering portion of your opinion, Doctor. What part of the brain are you looking at to tell if there's conscious pain and suffering in an infant?
> MR. BOSWORTH: I'm going to object to the foundation of the question. I think you're perhaps assuming a methodology that the doctor may or may not have

---

[4] 76 instances of witness coaching occur across four expert depositions by Kids2's count. *See generally*, Exhibit B.
[5] The witness ultimately testified consistent with Bosworth's coaching that the basis for this opinion was from seeing the photographs. Ex. F (Ross Tr.) pp. 33:15–34:17.

employed. But go ahead, Doctor, explain to her again how we know that babies
feel pain when they're dying.

*Id.* p. 128:4–14.

Similarly, at Dr. Rosen's deposition, Bosworth offered the following "objections" that

left no doubt how the witness should respond:

> MS. BASSIN: But I'm just wondering, would you -- as you sit here today, is it
> fair that you can't tell me what angle for a three-month-old would be necessary
> for, in a chin-to-chest flexion that would actually cause the jawbone to go back,
> be displaced and entirely cover the airway?
> MR. BOSWORTH: I'm going to object. I think he said nobody's put protractors
> on babies' necks, but if you want to read the literature, Alana, I would suggest
> you should.
>
> * * * * *
>
> MS. BASSIN: We can agree -- we can agree also that, for example, that 10
> degrees for a baby, regardless of the age, is considered safe, correct, to sleep at?
> MR. BOSWORTH: I'll object to the relevance because we ain't in a universe of
> anything that has 10 degrees here. But if you want him to answer that hypothetical
> question that has nothing to do with this case, proceed, Doctor.
>
> * * * * *
>
> MS. BASSIN: Okay. . . other than Dr. Mannen, okay, is there any study that
> you're aware of with a healthy three-month-old, good neck control, will suffer
> from chin-to-chest asphyxiation at a 34.8-degree angle?
> MR. BOSWORTH: Other than all the literature he's talked to you about for the
> last five hours? Is that what you're asking about, Alana?
> MS. BASSIN: I object to your objection, but –
> MR. BOSWORTH: I have to imagine you're not listening. I have to conclude
> you're not listening to the endless evidence that's in the literature, his experience,
> training, and expertise. I have to conclude you're not listening. I have to. I can't
> conclude anything else. But go ahead and continue.

Ex. E (Rosen Tr.) pp. 77:24–78:8, 83:13–20, 200:5–201:13.

Indeed, the witnesses admitted that they were relying on their coaching from Bosworth,

referencing his commentary in their answers:

MS BASSIN: Okay.  Okay.  So, and I just want to be clear.  You made that conclusion even though the coroner investigating, and the pathologist was not able to reach that conclusion.  Fair statement?

MR. BOSWORTH:  I'm going to object to the form of that question.  But go ahead, Doctor.

THE WITNESS: I mean, I think, as Tom had mentioned earlier, it's certainly correct, they did comment on the unsafe sleep . . .

*Id.* pp. 166:19–167:11.

The same dynamic played out at the deposition of Ms. Mannen, where Bosworth attempted to rephrase questions and absurdly insisted that Kids2's counsel were somehow required to show the witness documents while asking questions—the latter being a frequent theme of Bosworth's objections throughout the case:

MR. BOSWORTH: I'm going to object to the form. I think that that misstates her testimony. I don't know that she's testifying about, quote, "any infant product," end quote, but you can answer if you know what she's talking about.

THE WITNESS: So this specifically says the Kids 2 Ingenuity Bouncer, if I was consulted on that product design or other inclined sleep product design, based on the medical literature and measurements and such, that that posture I would not recommend against – I would recommend against a design that puts a baby in that posture.

* * * * *

MS. BULLARD: Have you seen the photograph that included the Boppy nursing pillow?

MR. BOSWORTH: I'm going to object to the form. And to the extent you're asking questions without any introduction of evidence, that's not how it works in the courtroom, right? Don't you remember –

MS. BULLARD: Tom.

MR. BOSWORTH: Let me finish, please.

MS. BULLARD: No.

MR. BOSWORTH: This is not just Kids2's case. I'm actually a lawyer in this case. I actually represent the plaintiffs. I can actually talk. I actually exist, and I'm a real person. I am here. So in a courtroom, you don't say, "Remember the photo at the zebra?" and then hide the photo of the zebra in some closet, or you don't show the witness what you're talking about. In the law, you actually show the jury the evidence, right? Because the judge instructs the jury what the lawyers say is not evidence because what the lawyers say is argument. What the lawyers say is not evidence. The evidence is the facts the jury sees, the photos they see, the witnesses' answers. So this whole examination, it's telling -- it's been, "Don't you

> remember this," and then you don't show her anything because it doesn't match up
> with what it actually shows. And I've been waiting patiently, and I cannot wait to
> show a jury what the actual facts are in this case because lawyer language is just
> that. It's just noise. But keep doing it. I've got all the time in the world. Go ahead.

Ex. D (Mannen Tr.) p. 192:1–13; pp. 146:15–148:2.

Finally, during Dr. Glancey's deposition, Bosworth's habit of clarifying and making suggestive commentary was the rule, not the exception. Ex. C (Glancey Tr.) p. 10:17–19 ("Object to the form. I don't know what that even means"); pp. 41:24–42:11 ("Wait. Wait. I just want to note for the record that I think your question is 'does money that's paid to you go to you.' Is that your question?"); pp. 81:10–82:10 ("he's not a lawyer, but you want to ask him about what laws stand for and waste all our time, go ahead. . . a stupid question").

As with other depositions, Bosworth interrupted Dr. Glancey's deposition to guide the witness how to answer, *e.g.*, *id.*, pp. 109:16–110:19, and to offer bizarre critiques of the questions, such as the following objection to a question about the applicable federal standards[6]:

> MR. BOSWORTH: I'm gonna object, because it's not the federal standard. You
> can keep saying it's the federal standard, like I could keep saying I'm a zebra, but
> I'm not. I'm a human being. So I object to the form. But keep saying it's the
> federal standard. And you can say that all you'd like but --

*Id.*, pp. 71:10--3:7.

Or this entirely inappropriate objection that led to Bosworth boasting about his purportedly decorous courtroom behavior:

> MS. BASSIN: Are bouncers allowed to be sold in America, as we sit here today?

---

[6] *See* 16 C.F.R. Part 1229, SAFETY STANDARD FOR INFANT BOUNCER SEATS ("This part establishes a consumer product safety standard for infant bouncer seats . . . Each infant bouncer seat must comply with all applicable provisions of ASTM F2167-22, Standard Consumer Safety Specification for Infant Bouncer Seats, approved on approved May 1, 2022. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.")

MR. BOSWORTH: With -- do you mean, just so I'm clear, Alana, with the same inadequate warnings that you had or with the warnings you put in now where you tell parents there's a suffocation risk?

MS. BASSIN: You know, you can't do that at trial and you can't do it now.

MR. BOSWORTH: Oh, I'll do it then and now.

MS. BASSIN: You simply can't. You can object and that's it. And here you object to form and preserve your objection. Objection. I am telling you you are acting totally inappropriately.

MR. BOSWORTH: No, I'm –

MS. BASSIN: So stop it, Tom.

MR. BOSWORTH: -- I'm asking you if you're asking him about now or about before.

MS. BASSIN: You need to -- you need to -- honestly, you need to behave in the same way that you would act in a court proceeding, and you are not doing that, Tom, and you need to start.

MR. BOSWORTH: Alana --

BY MS. BASSIN: Dr. Glancey --

MR. BOSWORTH: -- you don't -- I just have to get this on the record. I just have to get it on the record. I've been --

MS. BASSIN: Okay. I --

MR. BOSWORTH: I've been in many courtrooms before many judges before many juries in my six years. I've never had an issue with a judge or a jury in how I conduct myself. I represent my client zealously. I don't take advice from corporate lawyers on how I ought to behave. The only person I take instruction from in this world is my wife and my parents.

*Id.* pp. 113:18–116:13.

But perhaps most notable at Dr. Glancey's deposition was Bosworth's attempt to coach his witness and muddy the waters as to certain documentary evidence. For example, when Kids2's counsel simply tried to confirm that Dr. Glancey had not reviewed Kids2's design documents—referred to as "QRB documents"—in preparing his opinion in this case, Bosworth erupted with baseless accusations Kids2's counsel were lying:

MS. BASSIN: Well, I'm looking at your report and it doesn't list it, that you were provided any QRB documents.

MR. BOSWORTH: That's a false statement. You're making false statements about his report. It says documents produced by Kids 2 in his report. Stop lying. Fourth bullet.

MS. BASSIN: Stop coaching the witness.

MR. BOSWORTH: Fourth – it's not coaching. You're a liar. You're a liar.

*Id.* p. 264:3–15.

When Kids2's counsel attempted to question Dr. Glancey about a particular section of a document related to bouncer safety, Bosworth coached with interventions over nearly 20 pages to answer by referring to a different section of the document—and the witness of course obliged:

> MS. BASSIN: Dr. Glancey, have you seen this before?
> THE WITNESS: Not that I can recall, no.
> MS. BASSIN: All right. Okay.
> MS. BASSIN: Can you go down to the bouncer section, Jen?
> MR. BOSWORTH: You're skipping the part where it says sleep flat on your back?
> * * * * *
>
> MS. BASSIN: Dr. Glancey, back to my question. The fact that the bouncer seat safety is specifically addressed by the AAP, it is in fact true that the AAP nowhere says that bouncers should be banned, correct?
> THE WITNESS: I'll go back to the answer that I gave you before, which starts in the first section, which they say unequivocally to reduce the risk of sleep-related infant deaths, follow the ABC's of infant sleeps, which includes a bare crib or equivalent. At the bottom they clarify could be a crib or other safe sleeping surface.

*Id.* pp. 160:14–22; pp. 178:12–24.

These and numerous similar interjections, *e.g.*, Exhibit B (providing numerous other instances of Bosworth testifying at lns. 3, 4, 5, 6, 7, 10, 12, 18, 23, 28, 31), added considerably to the length of Dr. Glancey's deposition and prevented Kids2 from discovery to which it was entitled.

## III.     Bosworth also employed discourtesy and incivility to disrupt the expert depositions.

"It is well settled that in the course of deposition, an attorney is prohibited from engaging in so-called *Rambo* litigation, in which he attacks every question posed by the opposing counsel thus preventing the elicitation of any meaningful testimony from the witness." *York Grp., Inc. v.*

*Pontone*, 2012 WL 12895533, at *1 (W.D. Pa. Oct. 24, 2012).[7] Bosworth, however, was regularly combative and abusive in precisely the way condemned in *Pontone*, and his mudslinging pervades the transcripts. Bosworth's incessant objections often came with unprofessional remarks meant to bully or rebuke counsel's questions.[8]

For instance, Bosworth at times used his objections to disparage Kids2's counsel as slow-witted or desperate:

> MS. BULLARD: Well, if we agree that the child was harnessed, the body isn't going to -- the child's body isn't going to slouch forward or move forward like you're describing, is it, Doctor?
> MR. BOSWORTH: You already asked this, Jen. *For the sake of helping you understand the function of how this occurred, I'm going to let him answer again*, but I'm going to beg you not to ask it again because, just because it is 2:30. *You're now just, it kind of sounds like, grasping for straws* and retreading ground you have been through.
> MS. BULLARD: Tom, stop.
> MR. BOSWORTH: But can you answer the question again, Doctor, about the harness and she thinks that means that they can't slouch?
>
> * * * *
>
> MR. BOSWORTH: *I don't think your intelligence is as low as your questions reflect*, which leads me to believe you're trying to get answers you're not getting. It's 12:20. I have to go present a CLE on a record-breaking verdict.
> MS. BASSIN: I'm going to finish this question before you go.
> MR. BOSWORTH: On a record-breaking verdict.

---

[7]  *See* Pennsylvania Rules of Professional conduct, publicly available at http://www.padisciplinaryboard.org/for-attorneys/rules/rule/3/the-rules-of-professional-conduct (last accessed 1/9/2023).
-   **Preamble (5)** A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials.
-   **Preamble (12)** Every lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest which it serves.
-   **3.4 Fairness to Opposing Party and Counsel**
    A lawyer shall not: unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value or assist another person to do any such act.

[8]  By Kids2's count, Bosworth launched at least two dozen ad hominem attacks on Kids2's counsel.

Ex. F (Ross Tr.) p. 126:4–18; Ex. E (Rosen Tr.) pp. 128:8–129:8 (emphases added).

He also criticized Kids2's counsel multiple times over their admission pro hac vice, suggesting they were unaware of the operative rules of practice or decorum due to their residency in Minnesota. *See, e.g.*, Ex. D (Mannen Tr.) pp. 126:3–127:10 ("MR. BOSWORTH: You don't dictate how I practice law. You don't even practice law in this state.").

And he even maligned Kids2's questioning on the frivolous ground its counsel were simply searching for billable hours. *See id.* pp. 182:23–183:6 ("MR. BOSWORTH: Object on relevance. I can only imagine that this is for billable hour purposes at this point. But you can answer about a stroller, although this has nothing to do with a stroller.").

Dr. Glancey's deposition, in particular, is replete with examples of Bosworth's condescending and inflammatory remarks toward opposing counsel:

- "[I]t's not coaching. You're a liar. You're a liar." Ex. C (Glancey Tr.) p. 264:3–15.

- "It's an industry paper by corporations. You all get together in a room and write these silly little things that you then try to rely on when they don't even address hazards. Next question." *Id.* pp. 71:10–73:7.

- "He clearly told you he did. He said he didn't memorize it. And you're rude." *Id.* p. 87:21–88:20

- "No. You need to listen better and you need to stop wasting time." *Id.* pp. 103:20–104:16.

- "[T]hat's what he told you. So you can stop the misdirection." *Id.* pp. 109:16–110:19.

- "Your -- you violate the rule that my grandfather taught me, which is you can't take the heat, stay out the kitchen. He's given you his answer. You don't like it." *Id.* pp. 127:17–129:12.

- "You have no ability to adhere to the truth. You insist on distorting facts. You insist on creating a reality that doesn't exist. And y'all do that every time, and it's most notably understood because you don't ever show

anybody the evidence, because it doesn't say what you say it says. I am tired of it." *Id.* p. 134:14–23.

- "You all live in an alternate reality, you corporate schills. S-C-H-I-L-L." *Id.* pp. 272:20–275:11.

- "You just -- you don't have the ability to actually go head-on, so what you do is you ask people things about documents and you hide them from people." *Id.* pp. 278:15–280:4.

- "I think you either don't listen or you intentionally abuse people." *Id.* pp. 323:10–324:8.

- "[A] stupid question . . . You ask dumb questions." *Id.* p. 82:1–6.

Indeed, Bosworth's behavior deteriorated to such an extent during Dr. Glancey's deposition that Kids2 suspended the deposition after Bosworth asserted that its counsel's questions were the result of a physical, mental, or psychological disability:

> MS. BASSIN: Tom, I'm sorry. I need to get down for the record what you said. You said I had a hearing problem, a something problem, or a comprehension problem? What was the second insult?
> MR. BOSWORTH: I said you either have a hearing issue, a personality disorder, or a comprehension issue.

*Id.* p. 325:9–18.

## IV.    Sanctions are required to cure the prejudice from Bosworth's misconduct.

Given the pervasiveness of Bosworth's coaching, name-calling, and instructing his witnesses not to answer, it is impossible to know how Plaintiffs' experts would have testified absent his inappropriate conduct. *See, e.g.*, *Cordova v. United States,* No. CIV.05 563 JB/LFG, 2006 WL 4109659, at *3 (D.N.M. July 30, 2006) (awarding sanctions based on a lawyer's deposition coaching because "it became impossible to know if [a witness's] answers emanated from her own line of reasoning or whether she adopted [the] lawyer's reasoning from listening to his objections"). Courts in this state have imposed sanctions for conduct significantly less egregious than that of Bosworth. *See Johnson v. Wayne Manor Apartments*, 152 F.R.D 56, 59 (E.D. Pa. 1993)

17

(awarding a sanction of costs and fees, finding a deposition "transcript reveals numerous instances in which defense counsel improperly objected to the form of the question by either suggesting what he apparently believed to be an appropriate answer to his client or himself testifying"); *Cmty. Ass'n Underwriters of Am., Inc.*, 2014 WL 3055358, at *8 (imposing sanctions for costs and fees based on "speaking objections that appear to have been intended to suggest to the deponent how to answer a pending question"); *George V. Hamilton, Inc. v. Everett Co.*, 104 F.R.D. 106, 107 (W.D. Pa. 1985) (entering judgment in favor of plaintiff based on defendant's failure to produce discovery responses).

Possible sanctions at the Court's disposal include the preclusion of claims or defenses, issuance of a warning, a formal reprimand, placing the case at the bottom of the calendar, a fine, the imposition of costs or attorney fees, the temporary suspension of the culpable counsel from practice before the court, and dismissal of the suit unless new counsel is secured. Fed. R. Civ. P. 30; s*ee also GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 199 (E.D. Pa. 2008) (sanctioning counsel for Rule 30(d)(2) violations in the amount of $16,296.61 in costs and fees incurred in connection with the deposition); *George V. Hamilton, Inc.*, 104 F.R.D. at 112 (dismissing a party's defenses and counterclaims for extreme discovery misconduct); *Riverside Mem'l Mausoleum, Inc. v. Sonnenblick-Goldman Corp.*, 80 F.R.D. 433, 437 (E.D. Pa. 1978) (granting preclusion sanctions for discovery misconduct); 28 U.S.C. § 1927 (requiring attorneys to be responses for costs, expenses, and attorneys' fees incurred as a result of their unreasonable/burdensome behavior).

Kids2 suggests the below sanctions as appropriate remedies for the egregious and irredeemable behavior of Bosworth.

A.      **Plaintiffs' experts' "rebuttal" opinions should be excluded.**

Kids2 intends to file motions under Rule 702 seeking to preclude Plaintiffs' experts on a variety of grounds. As will be discussed in detail in those motions, Plaintiffs' experts should be precluded for failing to produce their expert files, refusing to produce data underlying their opinions, issuing opinions based on improper extrapolations from an entirely different product category (inclined sleep products rather than bouncer seats), and issuing opinions without taking into account Kids2's corporate representative deposition or any of Kids2's design documents. When these blatant violations of the Federal Rules and failure to meet the standards for expert testimony in this Court are coupled with Plaintiffs' counsel's deplorable conduct during these depositions, it becomes clear that full exclusion of Plaintiffs' experts is more than merited here, and Kids2 will explicitly seek that remedy in the forthcoming Rule 702 motions.

At this juncture, however, Kids2 requests the Court sanction Plaintiffs' counsel's litigation misconduct by excluding Plaintiffs' experts' so-called "rebuttal" opinions. As explained in Kids2's concurrently filed Motion to Strike, Plaintiffs' experts have submitted "rebuttal" reports. The reports, however, consist almost entirely of case-in-chief opinions and are clearly intended to address issues with the experts' original opinions. In other words, these "rebuttal" reports are nothing more than an attempt to compensate for inadequate expert opinions offered in Plaintiffs' case in chief and bootstrap in new opinions that were lacking from Plaintiffs' experts' opening reports and testimony. Case-in-chief opinions that were not disclosed by the time of the experts' depositions—due in no small measure to Bosworth's obstruction— must not be ushered in through the back door at the eleventh hour in the form of finely-tuned rebuttal opinions. Even if Plaintiffs continue to suggest their rebuttal opinions are true rebuttal opinions (they are not), the appropriate sanction is to still exclude them. Plaintiffs' counsel

repeatedly impeded Kids2's ability to get any real or clean cross-examination testimony due to repeated coaching, talking and instructions not to answer. It is forever prejudiced in this regard. The purpose of sanctions is to actually sanction for misconduct and the conduct should be narrowly tailored. Here, limiting Plaintiffs from supplementing expert opinions after inappropriate conduct during their expert depositions is the only real sanction that addresses the bad conduct other than excluding the testimony altogether.

Kids2 therefore requests that as both a matter of law and a sanction for Plaintiffs' counsel's conduct, all rebuttal reports from Plaintiffs' experts be struck. Importantly, second depositions of Plaintiffs' experts would not cure the prejudice and, to the contrary, would reward Plaintiffs' counsel's dilatory and obstructive behavior. Not surprisingly, Plaintiffs have already offered this to Kids2, proposing that Kids2 may retake the depositions given the putative rebuttal reports—an admission in and of itself that the reports contain new opinions and that new depositions are merited given Bosworth's conduct. And although Kids2 agrees that this may be necessary, it is not seeking new depositions as a remedy because new depositions will not cure the prejudice that has already occurred. Importantly here, the prejudice is more than just the time and money spent on the depositions and the delay in obtaining testimony. It is that the bell has been rung. Plaintiffs' experts have heard the cross-examination. They have been coached. They have had months to re-prepare for a second round of cross-examination. And that bell can never be unrung. Kids2's opportunity to obtain the unadulterated testimony from Plaintiffs' experts was deliberately thwarted by Bosworth, and striking Plaintiffs' rebuttal reports is a reasonable request, especially as the reports are inappropriate as a matter of law, as further explained in Kids2's Motion to Strike.

**B.      Monetary sanctions are also merited.**

Monetary sanctions cannot undo the substantive damage caused by Bosworth's inappropriate behavior, but they are at least a start. Bosworth's unprofessional and pervasive behavior throughout all four expert depositions merits a significant monetary sanction. Should the Court award the monetary sanctions suggested below, Kids2 will submit an affidavit of relevant costs and attorneys' fees so the proper amount owed can be calculated.[9]

Given the extreme nature of Bosworth's behavior, Kids2 should be reimbursed for the full costs and fees of attending each deposition, including attorneys' fees, witness fees, and court reporter costs. At a bare minimum, however, Kids2 should be reimbursed for the costs and fees it incurred in preparing and arguing this motion, which was entirely necessitated by the inappropriate and unprofessional behavior of Bosworth.

**C.      Stipulated Facts**

Plaintiffs' counsel refused to let his experts answer basic questions that are matters of fact. As a remedy, Kids2 seeks an Order that the below fact stipulations be entered prior to trial.[10] Notably, these proposed stipulated facts are truly *facts*, and there should be no argument otherwise. Unfortunately, Plaintiffs' prior counsel made clear that part of Plaintiffs' litigation strategy is to attempt to ignore or reframe these indisputable "facts," which should not be allowed. As such, entering an Order declaring the below as fact will help remedy Plaintiffs' counsel's bad behavior and will eliminate future needless disputes.

   1)  The AAP has never banned bouncer seats.

---

[9] Kids2 leaves up to this Court the decision who should pay: Bosworth, Kline and Spector, or a combination of the two.

[10] To the extent Plaintiffs argue this results in a preclusion of certain of their claims, that is an appropriate remedy. *See Titus v. Mercedes-Benz of North Am.*, 695 F.2d 746, 749 n.6 (3d Cir. 1982) (noting "that district courts may . . . consider as sanctions the preclusion of claims or defenses.")

2) Bouncer seats, including the subject product, are regulated by mandatory federal safety standard (16 C.F.R. Part 1229).[11]

## CONCLUSION

Plaintiffs' counsel's inappropriate conduct at the expert depositions has caused irreparable harm to Kids2. By improperly instructing witnesses not to answer, objecting argumentatively and suggestively to coach witnesses, and lodging frequent, personal insults at Kids2, the testimony from these depositions is muddled, influenced, and of limited value.[12] Although the testimony elicited is unrecoverably tainted, this Court should still work to fashion appropriate sanctions to best attempt to address Bosworth's complete and utter disregard of Rule 30. Kids2 therefore respectfully requests that sanctions be ordered, including but not limited to exclusion of Plaintiffs' expert rebuttals, costs and fees associated with this Motion and the expert depositions, and specific fact stipulations as set forth above.

---

[11] When Drs. Glancey and Mannen were questioned about 16 C.F.R. Part 1229, the federal standard governing the subject bouncer, Bosworth repeatedly, improperly objected and misstated multiple times on the record that there is no federal safety standard for infant bouncer seats. See fn. 6 *supra* discussing the federal standard; Ex. C (Glancey Tr.) pp. 69:13–70:3; Ex. D (Mannen Tr.) pp. 126:3–127:10. When Dr. Glancey was asked if he was offering an opinion that the Subject Bouncer does not meet the federal standard, Bosworth interjected and wrongly stated on the record that no federal standard exists. In tune with and tainted by Bosworth's repeated baseless objections and misstatements, Dr. Glancey testified "I don't know that it was necessarily adopted as a federal standard . . . ASTM is not a government agency. . . and [after another objection to form] Yeah. I'm beginning to feel you're asking me a legal question the way you just stated your last question. I'm not an attorney. I don't know what the legal consequences of citing the ASTM standard or adopting it means in terms of legal recognition and/or a significance with the code of federal standards." Ex. C (Glancey Tr.) pp. 69:13–78:2. Counsel for Kids2 attempted to ask Dr. Glancey about the federal regulation governing the product category of bouncer seats at least four other times, and Bosworth gave similar instructions not to answer on each occasion. *Id.* (Glancey Tr.) 127:17–129:12; 142:1–144:19; 150:19–153:9; 179:7–180:18.)

[12] Of note, while the sanctions suggested herein seek to address, as best as possible, Bosworth's misconduct, even the testimony that would remain if sanctions were granted in full would be incorrect and improper. Accordingly, Kids2 will also be preparing forthcoming evidentiary motions based on Fed. R. Ev. 702 once this motion and the extent of permissible use of these experts' depositions is decided.

**Nelson Mullins Riley & Scarborough LLP**

Dated: January 31, 2023

*s/ Jennifer L. Bullard*
Alana K. Bassin, Esq. (Pro Hac Vice)
Jennifer L. Bullard, Esq. (Pro Hac Vice)
Jenna Durr, Esq. (Pro Hac Vice)
1600 Utica Avenue South, Suite 750
Minneapolis, MN 55416
T: (612) 464-4500
F: (612) 255-0739
alana.bassin@nelsonmullins.com
jennifer.bullard@nelsonmullins.com
jenna.durr@nelsonmullins.com

-and-

William J. Conroy, Esq.
Yasha K. Shahidi, Esq.
Attorney ID Nos.: PA 36433/ PA 322044
Campbell Conroy & O'Neil, PC
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
T: (610) 964-6387
F: (610) 964-1981
wconroy@campbell-trial-lawyers.com
yshahidi@campbell-trial-lawyers.com
*Attorneys for Defendant, Kids2, Inc.*

## CERTIFICATE OF SERVICE

I, Jennifer L. Bullard, Esq., hereby certify that the foregoing ***KIDS2, INC.'S MOTION FOR SANCTIONS*** by filing the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

**Nelson Mullins Riley & Scarborough LLP**

Dated: January 31, 2023.

*s/ Jennifer L. Bullard*
Alana K. Bassin (Pro Hac Vice)
Jennifer L. Bullard, Esq. (Pro Hac Vice)
Jenna Durr, Esq. (Pro Hac Vice)
*Attorneys for Defendant Kids2, Inc.*