UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TANYA MCCARTNEY and MARK MONTGOMERY III, Individually and as Administrators of the ESTATE OF K.M., <br><br> *Plaintiffs* <br><br> v. <br><br> KIDS2, INC. f/k/a KIDS II, INC. and KIDS2, INC. d/b/a, t/a, a/k/a INGENUITY <br><br> *Defendants.* | CIVIL ACTION NO. 3:21-cv-166 <br><br><br> **PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANT KIDS2, INC.'S MOTIONS FOR SANCTIONS AND TO STRIKE REBUTTAL TESTIMONY** |

The conduct during depositions in this matter of former counsel of record, Thomas Bosworth, was awful.  However, any conceivable prejudice suffered by defendants as a result of this conduct can be easily remedied by continuing the depositions.  While sanctions against Attorney Bosworth individually are within this Court's sound discretion, direct sanctions against plaintiffs or Kline & Specter are not, and plaintiffs respectfully request that defendants' Motion for Sanctions be denied in that regard.  Additionally, plaintiffs' rebuttal reports contain proper rebuttal, and plaintiffs respectfully request that defendants' Motion to Strike certain aspects of those reports be denied.

## I.     BACKGROUND

This product liability action arises out of the tragic and preventable death of plaintiffs' three-month-old infant son, K.M., who suffocated to death in defendant Kids2, Inc.'s defectively designed inclined bouncer.  *See* Complaint attached as Exhibit "A."  Defendant Kids2, Inc., ("Kids2") kept the product on the market despite knowing that it posed a risk of suffocation and death to infants like K.M.  *Id.*

This Court's January 18, 2022 Initial Scheduling Order set an October 7, 2022 deadline for plaintiffs' expert disclosures and a December 23, 2022 deadline for defendant's expert disclosures. *See* January 18, 2022 Initial Scheduling Order attached as Exhibit "B." The Initial Scheduling Order did not establish a deadline for rebuttal reports. *Id.* A deadline of November 25, 2022 was established for the depositions of plaintiffs' experts, and a deadline of February 27, 2023 was established for the depositions of the defense experts. *Id.* By Final Scheduling Order dated September 1, 2022, the Court set a summary judgment motion deadline of April 18, 2023, and an August 21, 2023 deadline for Motions *in Limine* and proposed Points for Charge and Voir Dire. *See* Final Scheduling Order dated September 1, 2022, attached as Exhibit "C." Plaintiffs' and defendant's pretrial statements are due on September 1, 2023 and September 8, 2023, respectively, a pretrial conference is scheduled for September 11, 2023, and the case will presumptively be called for trial on September 18, 2023. *Id.*

Plaintiffs served timely expert disclosures on October 7, 2022, identifying and producing the reports of engineering expert James Glancey, Ph.D., P.E., human factors expert Timothy Joganich, M.S., C.H.F.P., biomechanical engineering expert Erin Mannen, Ph.D., pediatric pulmonology expert Dennis Rosen, M.D., and forensic pathologist Wayne Ross, M.D. Defendant Kids2 served timely expert disclosures on December 23, 2022, identifying and producing the reports of injury biomechanics expert Daniel L.A. Camacho, M.D., Ph.D., forensic pathologist Kimberly A. Collins, M.D., pediatric neonatology expert Jay P. Goldsmith, M.D., regulatory expert Joseph P. Mohorovic, C.P.S.M., and human factors expert Joseph Sala, Ph.D. and biomechanical engineering expert Michael T. Prange, Ph.D., M.E.

On November 3, 2022, former Kline & Specter attorney Thomas Bosworth deposed defendant's corporate designee, Andrew Farhat. Defendant then conducted depositions of

2

plaintiffs' experts prior to the Court's deadline.  Defense counsel deposed Dr. Mannen on November 8, 2022, Dr. Ross on November 15, Dr. Rosen on November 16, Dr. Glancey on November 17, and Mr. Joganich on November 23, 2022.  Former Kline & Specter attorney Thomas Bosworth defended the depositions of plaintiffs' experts, with the exception of the deposition of Mr. Joganich, which was defended by Kline & Specter partner Michael A. Trunk, Esquire.

Plaintiffs produced rebuttal expert reports by Dr. Glancey, Dr. Mannen, Dr. Rosen, and Dr. Ross on January 23, 2023.  In response to defendant Kids2's production of the report of a regulatory expert, plaintiffs also produced a rebuttal report by regulatory expert the Hon. Marietta S. Robinson.  Through an oversight by plaintiffs' prior counsel, an economic expert report was not produced on plaintiffs' behalf on October 7, 2022.  On January 23, 2023, plaintiffs moved this Honorable Court for permission to produce a late expert disclosure from forensic economist Andrew Verzilli, M.B.A.  Defendant Kids2 responded in opposition to this Motion on January 31, 2023, and the Motion is currently pending before the Court.

On January 31, 2023, defendant Kids2 filed a Motion for Sanctions and Motion to Strike Improper Rebuttal Expert Testimony.  By Order dated February 1, 2023, this Court directed plaintiffs to file an omnibus response to both Motions no later than February 15, 2023.  For the reasons set forth below, both the Motion for Sanctions and the Motion to Strike Improper Rebuttal Testimony should be denied.

## II.   ARGUMENT

### A.   Defendant Kids2's Motion for Sanctions Should Be Denied.

Defendant Kids2 seeks a wide variety of sanctions based on Attorney Thomas Bosworth's awful conduct during the depositions of defendant's corporate designee and plaintiffs' experts in this case.  However, defendant's proposed sanctions are unjust and disproportionate.  First,

sanctions targeting present counsel and their clients will not expedite this case or deter the offending attorney from committing future misconduct; they will merely harm the plaintiffs' case on the merits.   And second, defendant fails to demonstrate why the sanctions of precluding plaintiffs' rebuttal reports and entering stipulated facts are warranted in place of the far more tailored and suitable remedy: reconducting the depositions in question.

**1. Plaintiffs Should Not Suffer for Their Former Attorney's Misconduct and Sanctions Based on Attorney Bosworth's Misconduct Should be Directed Towards Attorney Bosworth Individually.**

Both legally and practically, a litigation sanction should be directed at the offender to serve the policies of punishment and deterrence while also being fundamentally fair.   In this case, a sanction that punishes the plaintiffs for the conduct of their counsel would not advance the interests of punishment and deterrence.   It would be unfair and unjust as well, especially given the opportunities to cure the prejudice caused by Attorney Bosworth's conduct.   Defendant Kids2 seeks attorney's fees and costs, to exclude rebuttal reports of plaintiffs' experts, and the stipulation of certain facts.   Fees and costs should be directed toward Attorney Bosworth, and the Court should not implement evidentiary sanctions that punish Attorney Bosworth's former, innocent clients.

**a.  Legal background**

Long-standing legal principles support this conclusion.   By way of first principles, practice before this court must comport both with the Federal Rules of Civil Procedure and the Pennsylvania Rules of Professional Conduct.   Rule 30 of the Federal Rules of Civil Procedure governs counsel's conduct during depositions, including permissible objections and instructions. That Rule specifically allows courts to sanction counsel for interfering with the fair depositions of witnesses.   F.R.C.P. 30.   Moreover, the courts are vested with broader equitable and inherent powers that allow them "to impose silence, decorum, and respect, and to require submission to

4

rules of fair play . . . so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal quotation omitted).

In all legal proceedings, attorneys are held to high standards of conduct and decorum. The courts may impose sanctions to enforce these standards and punish malfeasant attorneys for violating them. *Dunbar v. Triangle Lumber & Supply Co.*, 816 F.2d 126, 129 (3d Cir. 1987). Sanctions also serve to deter the wider legal community from engaging in similar behaviors. *Id.* For this reason as well, courts have ample discretion in determining what sanctions are appropriate and necessary to deter attorney misconduct. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 538 (3d Cir. 2007). Further, courts have wide latitude to determine who sanctions should be directed toward: parties, law firms, or individual attorneys. *Id.*

An important guidepost in sanctions jurisprudence is that attorneys rather than clients should be punished for attorney misconduct. As the Third Circuit explained in *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65 (3d Cir. 1994), "[i]f any attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney." *Westinghouse*, 43 F.3d 65 at 74 (citations omitted). *See also Boughner v. Sec'y of Educ. & Welfare*, 572 F.2d 976, 978 (3d. Cir. 1978) ("We have increasingly emphasized visiting sanctions directly on the delinquent lawyer, rather than on a client who is not actually at fault."); *Simmons v. Minerley*, No. 5554/06, 2007 WL 2409595, at *5 (N.Y. Aug. 24, 2007) (ordering monetary sanctions against an attorney for deposition misconduct instead of striking paragraphs from the complaint, because the latter would "unfairly punish the plaintiffs for the conduct of their attorney."). Indeed, the Third Circuit has held that when a sanction unjustly punishes a client who bears no personal responsibility for their attorney's actions, the sanction may constitute an abuse of discretion and

warrant reversal.  *See Dunbar*, 816 F.2d at 128-29 (reversing a dismissal based on the "flagrant actions" of counsel because of the client's non-involvement).

Close examination of attorney versus client fault is particularly appropriate to sanctions resulting from misconduct during depositions, where the transcripts can directly reveal whose actions frustrated the deposition.  *See, e.g.*, *Arietta v. City of Allentown*, No. 04-5306, 2006 WL 8459372, at *3 (E.D. Pa. Apr. 7, 2006) (directing certain fees at specific counsel and not at the parties for deposition misconduct); *Boyd v. Univ. of Md. Med. Sys.*, 173 F.R.D. 143, 150 (D. Md. 1997) (same); *Van Pilsum v. Iowa State Univ. of Sci. and Tech.*, 152 F.R.D. 179, 181 (S.D. Iowa 1993) (same); *Clarity Sports Int'l LLC v. Redland Sports*, 1:19-CV-00305, 2021 WL 2981038, at *5 (M.D. Pa. July 15, 2021) (same).  For example, when attorneys have given improper instructions not to answer, instead of the deponent independently refusing to answer, courts have instructed the offending attorney specifically to pay the costs and fees of re-deposition.  *Frazier v. Southeastern Pa. Transp. Auth.*, 161 F.R.D. 309, 321 (E.D. Pa. 1995).

There is no question that attorneys may be punished stringently in cases where that attorney engages in improper coaching or instructions while defending a deposition.  Those penalties may include the removal or temporary removal of the offending counsel, including by terminating their representation or revoking their *pro hac vice* status.  *See Leis v. Flynt*, 439 U.S. 438, 442 (1979) (describing *pro hac* status as a privilege not a right of counsel); *Johnson v. Trueblood*, 629 F.2d 302, 303-04 (3d Cir. 1980) (discussing how the sanction of revoking *pro hac vice* status punishes the client).  *See also Paramount Comm'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 56 (Del. Sup. 1994) (discussing whether an attorney's deposition misconduct should be considered in their future applications for *pro hac vice* status in Delaware).

Careful assessment of whether the attorney or clients were responsible for the litigation misconduct is especially important in the context of financial penalties.  As the Third Circuit has explained, the issuance of monetary sanctions "should [always] be guided by equitable considerations."  *Doering v. Union Cty. Bd. of Chosen Freeholders*, 857 F.2d 191, 195 (3d Cir. 1988).  As such, the court may divide these sanctions in line with the respective actor's level of fault.  *See Hildebrand v. Allegheny Cnty.*, 923 F.3d 128, 132-33 (3d. Cir. 2019) (discussing the role of a party's responsibility when determining whom to direct sanctions toward).  *See also Wabote v. Ude*, No. 5:21-CV-2214, 2022 WL 684844 at **12-13 (E.D. Pa. Mar. 8, 2022) (citing *Westinghouse*, 43 F.3d 65, 74 (3d Cir. 1994)) (stating that "[t]he Court determines that Ude's Counsel is responsible for a majority of the conduct that frustrated the second deposition and for disobeying the Discovery Order" and ordering him to pay fines).

> b. **Plaintiffs themselves did not commit the misconduct at issue; Attorney Bosworth alone acted wrongfully.**

The Court should assign fees and costs to Attorney Bosworth individually, if to anyone. To determine who a sanction should target, the court should examine the record to determine who was culpable for the offending conduct.  *See, e.g.*, *In re Tutu Contamination Litig.*, 162 F.R.D. 46, 79-80 (D.V.I. 1995) (examining the record to determine which attorneys had personal knowledge of the existence of documents that were deceptively not disclosed).  In so doing, an attorney may be "held to a higher standard" than a deponent or other party who interferes with a deposition "because he is an officer of the court. In other words, he should know better."  *Wabote*, 2022 WL 684844, at *13.  Because of this, an attorney may be held responsible and sanctioned purely for not controlling a belligerent client, as they have a particular duty to enforce the rules of fair play. *See GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 197-98 (E.D. Pa. 2008) (sanctioning an attorney who allowed his witness to harass questioning counsel).  This accords with the broader principle

that "[d]efaults in professional obligations are a blight on the legal system and a betrayal of the privilege accorded the legal profession." *Dunbar*, 816 F.2d at 129. Plaintiffs agree with defendant that the Court has three bases of authority from which it may issue sanctions against Bosworth for his conduct: FRCP 30(d)(2), the Court's inherent power, and 28 USC Sect. 1927. Additionally, the Court has the power to hold Bosworth in contempt of court, and fashion any sanction around contempt.

Here, there is no question that the misconduct at issue was performed by Attorney Bosworth. This attorney was terminated from Kline & Specter, P.C. [hereinafter "Kline & Specter"] on November 18, 2022.[1] No one at Kline & Specter was aware of Mr. Bosworth's deposition misconduct in this case until November 21, 2022, by which time he had already been discharged. Upon being advised, Kline & Specter immediately expressed regret to defense counsel. Mr. Bosworth will have nothing more to do with this matter. Under these circumstances, there is no risk that he will further impede the litigation and no need to consider a sanction barring or limiting his representation of plaintiffs. As counsel for defendant stated to the Court during the December 5, 2022 telephonic status conference hearing, "Mr. Trunk [new counsel of record for the plaintiffs] and I had a very productive conversation today. I want to note for the record that he apologized for the prior conduct of former counsel, and I am confident that we will have a good working relationship in the future." *See* Transcript of December 5, 2022 Telephone Status Conference Proceedings attached as Exhibit "E" at 5:22-6:1.

---

[1] Among the acts of professional misconduct that caused Bosworth to be fired from Kline & Specter was misbehavior in deposition. *See* Excerpt from May 17, 2022 Deposition of Divya Kurian, M.D., in the Philadelphia Court of Common Pleas matter of *Kaplan v. Hospital of the University of Pennsylvania, et al.*, Docket No. 210100802, attached as Exhibit "D" at 130:1-23 (Bosworth inappropriately asks defense counsel what he's going to do to him, "either on Zoom or off Zoom," and calls defense counsel an "obstructive jerk" and "dishonest").

Yet, in its motion, defendant Kids2 does not specifically request sanctions against Attorney Bosworth himself. It is unclear, but based upon its filing, plaintiffs imply that defendant Kids2 seeks monetary sanctions against the plaintiffs and/or the law firm that terminated Bosworth for, *inter alia*, engaging in behavior akin to that which he exhibited in this case. Defendant has not pointed to a single instance of misconduct by an attorney now employed by Kline & Specter who is currently entered in this matter. While it is undeniable that Kline & Specter employed Bosworth when he acted abusively in this case, the firm did not sanction or approve of his misconduct in any way and is taking all steps to set the litigation back on track.

It is clear from the examples of misconduct provided by opposing counsel that none of plaintiffs' experts actively participated in Attorney Bosworth's disruptions. The excerpts highlighted by defendant Kids2 consistently show that the experts did not independently refuse to answer defense counsel's questions. They were not complicit in any misconduct or frustration of their depositions. For instance, defendant highlights this exchange where Attorney Bosworth instructed plaintiffs' expert Dr. Glancey not to respond:

> MS. BASSIN: Now I understand you that you're not calling this an incline sleeper, but you believe that it is a bouncer that has an incline to which can kids could fall asleep; fair statement?
>
> MR. BOSWORTH: I'm gonna object. It's been asked and answered. It's harassing. Under Rule 30, he's not gonna answer it for those reasons. Next question.
>
> MS. BASSIN: Is that a fair statement, Dr. Glancey?
>
> THE WITNESS: I was –
>
> MR. BOSWORTH: Hold on.
>
> THE WITNESS: I was instructed not to answer.
>
> MR. BOSWORTH: Yeah. Harassing. Harassing. Next question.

Def. Mot. for Sanctions, p. 7, citing to Exhibit C thereto (Glancey Depo. Tr.) at 150:19–153:9. This example is typical.  Defendant has not and cannot point to a single instance where plaintiff's experts independently refused to answer absent instruction from Attorney Bosworth.

The sanctions that defendant Kids2 proposes would serve to punish and prejudice the plaintiffs and Kline & Specter despite the fact that even defendant has illustrated that only one attorney was to blame.  This observation is not to minimize the nature of the misconduct.  But sanctions that narrow the evidence in a case prejudice the client because they minimize their chances of obtaining relief.  As noted above, in situations such as this where the misconduct was committed by the lawyer alone, courts "have increasingly emphasized visiting sanctions directly on the delinquent lawyer, rather than on a client who is not actually at fault."  *Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 807 (3d Cir. 1986) (citing *Matter of MacMeekin*, 722 F.2d 32, 35 (3d Cir.1983)).  In *Carter*, the Court made clear that sanctions that would harm an innocent client's interest should be disfavored in favor of other sanctions that target the attorney directly. *Id.* at 807-08; s*ee also In re Neurontin Antitrust Litig.*, MDL Docket No. 1479, 2011 WL 253434 at *19 (D.N.J. Jan 25, 2011) (ordering the re-deposition of witnesses with protocols but declining to strike answers or establish certain facts so as not to prejudice the party where the lawyer alone committed the misconduct).  Courts around the country have imposed serious sanctions for improper conduct at deposition, including fines and the revocation of *pro hac vice* status, imposed directly on the individual attorney who committed the misconduct.  *See Layne Christensen Co. v. Bro-Tech Corp.*, 2011 WL 6934112 (D. Kan. Dec. 31, 2011) (fining individual attorney for improperly instructing deponent not to answer questions); *Saldana v. Kmart Corp.*, 84 F. Supp. 2d 629 (D.V.I. 1999) (fining individual attorney for vulgar and uncivil conduct during depositions); *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182 (E.D. Pa. 2008) (fining individual attorney for failing

to intervene when deponent refused to answer legitimate questions); *Mruz v. Caring, Inc.*, 107 F. Supp. 3d 596 (D.N.J. 2000) (revoking attorney's *pro hac vice* admission due to abusive and obstructive behavior during a deposition); *State v. Mumford*, 731 A.2d 831 (Del. Super. 1999) (revoking attorney's *pro hac vice* status for violating the Delaware Canons and the Principles of Lawyer Conduct when failing to restrain disrespectful behavior by client during a deposition).

Simply put, defendant's proposed sanctions would punish the wrong people.  They also would distract from the legal system's cardinal purpose: adjudicating the litigants' claims on their merits.  As the Third Circuit explained in *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir. 1984), "[a]lthough sanctions are a necessary part of any court system, we are concerned that the recent preoccupation with sanctions and the use of dismissal as a necessary 'weapon' in the trial court's 'arsenal' may be contributing to or effecting an atmosphere in which the meritorious claims or defenses of innocent parties are no longer the central issue.  It does not further the goal of a court system, that of delivering evenhanded justice to litigants."  *Id.* at 867.  While the Third Circuit made these remarks in the context of considering outright dismissal as a litigation sanction, the point applies equally to this case where the proposed sanctions include hampering plaintiffs' ability to bring their case.

Defendant's proposed sanctions also would not have the deterrent effect of dissuading misconduct in the future – at least not by Attorney Bosworth.  In its motion, defendant Kids2 relies heavily on unprofessional comments and *ad hominem* attacks on defense counsel by Attorney Bosworth.  Attorney Bosworth's public commentary indicates a lack of remorse and a doubling down on misconduct.  In a *Legal Intelligencer* story first published online on February 3, 2023, Bosworth evaded responsibility and sought to blame the defendant.  *See* Max Mitchell, "Coaching, Intimidation and Personal Insults: Nelson Mullins Lawyers Seek Sanctions Over Ex-Kline &

11

Specter Attorney's Conduct", THE LEGAL INTELLIGENCER, February 3, 2023 at 10:10 AM, https://www.law.com/thelegalintelligencer/2023/02/03/coaching-intimidation-and-personal-insults-nelson-mullins-lawyers-seek-sanctions-over-ex-kline-specter-attorneys-conduct/ (last visited February 15, 2023), printout attached as Exhibit "F" ("Bosworth, however, said the defense's characterization of the deposition turns events on their head, and it was the defense attorneys who had acted improperly during the initial round of depositions….").

> **2. More Extreme Sanctions Are Not Necessary Because Attorney Bosworth's Misconduct Did Not Substantially Prejudice Defendant Kids2 and Any Prejudice that Resulted from Attorney Bosworth's Misconduct Can Be Remedied by Re-Taking the Depositions.**

Defendant Kids2 seeks to preclude plaintiffs' rebuttal reports and enter stipulated facts based on a blanket assertion that Attorney Bosworth's misconduct during the depositions incurably tainted plaintiffs' experts' testimony and prejudiced defendant.  However, defendant Kids2 has not and cannot demonstrate that Attorney Bosworth's attempts at witness coaching actually resulted in any of plaintiffs' experts changing their expert opinions or answering defense counsel's questions differently.  Moreover, the appropriate remedy in this case, if any, is for the Court to order the re-taking of the depositions in question.  Plaintiffs have already agreed to the re-taking of those depositions.  This would enable defense counsel to obtain answers to any questions that were improperly objected to and allow this case to proceed on its merits.

> **a. Retaking the depositions provides an appropriate remedy.**

This approach would address the misconduct while falling within the Court's broad discretion to order an appropriate sanction for misconduct by an attorney.  *Bowers*, 475 F.3d 524, 538 (3d Cir. 2007).  That inherent power "must always be exercised with caution," and the court must take "care in the use of inherent powers to impose sanctions." *Derzack v. Cnty. of Allegheny, Pa.*, 173 F.R.D. 400, 412 (W.D. Pa. 1996) (quoting *Martin v. Brown*, 63 F.3d 1252, 1265 (3d. Cir.

1995)) (internal citation omitted) (*aff'd sub nom. Derzack v. Cnty. of Allegheny Child. & Youth Serv's*, 118 F.3d 1575 (3d Cir. 1997)).  Sanctions should not extend beyond that which is necessary to remedy the violation.  *Westinghouse*, 43 F.3d 65, 74 (3d Cir. 1994).  *See also Bartos v. Pennsylvania,* Civ. No. 08–366, 2010 WL 1816674 at *6 (M.D. Pa. May 5, 2010) ("sanctions should always be narrowly tailored to meet the misconduct and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing") (citing *Klein v. Stahl, GMHB & Co. Maschinefabrik*, 185 F.3d 98, 108-09 (3d Cir. 1999)).

Focusing on retaking affected depositions also would be consistent with equitable considerations, such as whether the misconduct was part of a pattern of wrongdoing, whether prejudice had already occurred, and whether there were mitigating factors.  *Westinghouse*, 43 F.3d at 74; *Poulis*, 747 F.2d at 868.  As a matter of process, a court weighing prejudice appropriately examines whether the "wrongdoing [] actually prejudices the wrongdoer's opponent or hinders the administration of justice . . . [or whether] through good fortune or diligence of court or counsel, fails to achieve its untoward object."  43 F.3d at 74.  The court considers why it should opt for a particular sanction as compared to other available alternatives.  *Id.*  The court need not exhaust all other sanctioning mechanisms prior to resorting to its inherent power, but it must explain why it has chosen any particular sanction from the range of alternatives it has identified.  *Id.* (internal citations omitted).  Here, the most narrowly tailored and appropriate sanction when an attorney interferes with their adversary's ability to elicit testimony during a deposition is to order the re-deposition of the witness, so that questioning counsel may obtain the answers they are entitled to.  This remedy preserves the adversarial process without undermining the core purpose of depositions, namely, to seek the truth.  *Hall v. Clifton Precision, a Div. of Litton Sys's, Inc.*, 150 F.R.D. 525, 528 (E.D. Pa. 1993).  Of course, in those instances when Attorney Bosworth

improperly objected to permissible questions, the court may specifically direct that the questioning attorney be allowed to re-ask those questions. *Plaisted v. Geisinger Med. Ctr.*, 210 F.R.D. 527, 535-36 (M.D. Pa. 2002).

An order providing for the retaking of depositions could include specific rules of conduct and order that the attorneys follow these at the second deposition.  In the lauded case *Hall v. Clifton*, Judge Gawthrop provided a list of precise instructions for counselors to abide by during the repeat depositions, including not making statements that suggest an answer to a witness, not directing a witness not to answer absent a privilege, objecting succinctly, and that witnesses should request clarifications of questions from opposing counsel only. *Hall*, 150 F.R.D. at 531-32.  Since *Hall*, while ordering the re-deposition of witnesses as a cure for improper coaching and instructions, other judges in this Circuit have ordered litigants to adhere to these rules as well. *See, e.g.*, *Peronis v. United States*, 2:16-cv-01389-NBF, 2017 WL 696132 at *1, (W.D. Pa. Feb. 17, 2017); *O'Brien v. Amtrak*, 163 F.R.D. 232, 237 (E.D. Pa. 1995).  *See also R.E. Linder Steel Erection Co., Ins. v. U.S. Fire Ins. Co.*, 102 F.R.D. 39, 41 (D. Md. 1983) (ordering counsel to abide by certain protocols during re-depositions because "[t]he depositions have been contaminated from start to finish with interrupted questions, *ad hominem* comments, and argumentative colloquy, sometimes running on for pages.").  The Court could include similar directives in this case, although, as Attorney Bosworth is no longer in the case, there is no prospect that litigation abuse will continue.

### b. Precluding evidence and stipulating facts would not be narrowly tailored to the misconduct in this case.

Re-deposing the witnesses make sense in the context of this case.  It is consistent with the majority of cases where an attorney has engaged in improper witness coaching and instructions. In those cases, courts regularly have found that the appropriate remedy is to order the re-deposition

of the witness, not to impose factual stipulations or exclude other evidence.  This is illustrated in Sections IV.A and IV.C of their brief wherein defendant asks this Court to exclude plaintiffs' expert rebuttal opinions and to enter factual stipulations respectively.  Defendant does not point to a single case in which the court determined that the proper sanction for deposition misconduct was the exclusion and stipulation of evidence, as opposed to re-conducting the deposition and/or ordering the payment of fees and costs.  The only cases where they point to sanctions that would materially prejudice the party's case are wholly inapposite.

Defendant cites to numerous non-binding cases for the proposition that their outsized proposed sanctions are warranted here.  Defendant cites to *George v. Hamilton*, where the court entered judgment in favor of the party moving for sanctions, because the sanctioned party's conduct led to the permanent loss of evidence and therefore irreversible prejudice, the client was integrally involved in the misconduct, and repeated prior sanctions had failed.  *George v. Hamilton, Inc. v. Everett Co., Ins.*, 104 F.R.D. 106, 109-112 (W.D. Pa. 1985).  Defendant also cites to *Riverside Mausoleum*, where the court issued a preclusionary order after the sanctioned party repeatedly did not provide briefing by the Court's deadlines, failed to provide discovery responses before the discovery deadline, provided non-responsive responses after the discovery deadline, and repeated prior sanctions had failed.  *Riverside Mem'l Mausoleum, Inc. v. Sonnenblick-Goldman Corp.*, 80 F.R.D. 433, 434-37 (E.D. Pa. 1978).  And finally, defendant cites to *Tacori Enterprises*, in which the sanctioned party willfully violated the court's prior discovery order in two distinct regards, repeatedly refused to produce a 30(b)(6) witness for deposition, and only provided discovery responses shortly before the discovery deadline.  *Tacori Enter's v. Beverlly Jewellery Co. Ltd.*, 253 F.R.D. 577, 583-84 (C.D. Cal. 2008).  The misconduct at issue here is worlds apart from that in those cases.  More pertinent are cases in which the court

determined that the fitting remedy when counsel was obstructive during a deposition was the re-deposition of the witnesses, and sometimes reasonable expenses and attorney's fees. Not surprisingly, those are the very sanctions given as examples in the text of Rule 30. F.R.C.P. 30.

Plaintiffs have already offered to produce plaintiffs' expert witnesses for re-deposition as a demonstration of good faith and recognition of Attorney Bosworth's actions. Plaintiffs' counsel have made assurances that they would not impede defense counsel at these repeat depositions.

### b. Retaking of affected depositions makes especially good sense where the deponents were expert witnesses who already have served expert reports.

The re-deposition of these witnesses is a particularly suitable remedy given that the witnesses in question are plaintiffs' experts, not lay witnesses. Defendant is in possession of plaintiffs' expert reports and rebuttal reports and is therefore wholly on notice as to their likely testimony.

In Section I of their brief, defendant points to several instances where the witnesses were improperly instructed not to answer. Defendant is entitled to answers to many of these questions. But defendant is not substantially prejudiced by these instances in their ability to prepare a defense in this case, precisely because they are in possession of the experts' reports.

In Section II of their motion for sanctions, defendant points to nine exchanges where Attorney Bosworth made speaking objections. But they do not point to a single example where the witness then parroted Attorney Bosworth's objections. Defendant has not demonstrated that plaintiffs' experts ever deviated from their expert opinions as contained in their reports, even in the face of Attorney Bosworth's transparent attempts to steer their depositions. For example, they point to this objection where Attorney Bosworth objected to a hypothetical by inserting that it was irrelevant, but the transcript reveals that the expert went on to answer the question posed:

MS. BULLARD: We can agree -- we can agree also that, for example, that 10 degrees for a baby, regardless of the age, is considered safe, correct, to sleep at?

MR. BOSWORTH: I'll object to the relevance because we ain't in a universe of anything that has 10 degrees here. But if you want him to answer that hypothetical question that has nothing to do with this case, proceed, Doctor.

DR. ROSEN: No, I would not agree with that. I would say that babies should sleep flat, on firm, flat surfaces and they should not have --

MS. BULLARD: Okay.

DR. ROSEN: And what's interesting, too, I mean this is something which I think is relevant because it certainly is true that the 2022 update of the guidelines is stricter than the previous ones or is more clear. But if you look back at, for example, the 2016 guidelines, there were exceptions made to elevating the head in the bed with children who have specific malformations, you know, what they call an unrepaired laryngeal cleft, which is communication between the esophagus and the trachea, in which it was -- you know, people were very concerned about aspiration, reflux and aspiration. And so that was deemed to be an appropriate strategy for very specific cases. Currently that's not -- I mean that's been recanted by both the American Academy of Pediatrics and the National Association of Pediatric GI, whatever. Babies are not supposed to be elevated.

MS. BULLARD: So my mistake, Doctor. I thought you had referenced that 10 degrees is okay because that was the bassinet standard that is still allowed and sold for products and the AAP endorses. But you're not -- you're not saying that even 10 degrees is okay?

DR. ROSEN: Babies should be on a flat surface. Flat, on a flat surface.

Excerpt of Deposition of Dr. Rosen attached hereto as Exhibit "G" at 83:13-84:22.

Likewise, defendant points to this exchange where Attorney Bosworth implied defense counsel's question was opaque, but the transcript reflects that the witness went on to provide a specific answer:

MS. BULLARD: And so, based on your CAMI testing, you're concluding that no infant products should have a concave surface?

MR. BOSWORTH: I'm going to object to the form. I think that that misstates her testimony. I don't know that she's testifying about, quote, "any infant product," end quote, but you can answer if you know what she's talking about.

THE WITNESS: So this specifically says the Kids2 Ingenuity Bouncer, if I was

consulted on that product design or other inclined sleep product design, based on the medical literature and measurements and such, that that posture I would not recommend against – I would recommend against a design that puts a baby in that posture.

Excerpt of Deposition of Dr. Mannen attached hereto as Exhibit "H" at 191:25-192:13.

As these passages illustrate, defendant Kids2 was not prejudiced by unanticipated testimony or testimony that echoed Attorney Bosworth's attempted coaching.

Moreover, since the expert depositions that were defended by Attorney Bosworth, plaintiffs have served rebuttal reports by all four of these experts. Hence, defendant is likely to seek to reconvene those experts for deposition anyway to explore their rebuttal opinions, and this can be accomplished without undue delay of the trial in this case.

In conclusion, defendant Kids2's proposed sanctions are out of line with the prejudice they suffered, if any. Their argument that the "bell has been rung" is a hyperbolic attempt to hamstring plaintiffs' case on the merits by seeking the preclusion of evidence, instead of agreeing to the appropriate measure that plaintiffs have already proposed. Instead, defendant seeks to end-run around the clear solution of re-deposing the witnesses and to capitalize on this opportunity for tactical gain. By seeking judicial notice of certain facts and the exclusion of plaintiffs' expert rebuttal reports, defendant Kids2 proposes broad, unjust sanctions that are ill-tailored to the violating conduct and unnecessary to remedy any purported prejudice.

### B.   Defendant Kids2's Motion to Strike Rebuttal Testimony Should Be Denied.

#### 1.   Plaintiffs Produced Proper Rebuttal Reports.

##### a.   Applicable Standard.

Federal Rule of Civil Procedure 26 permits the production of expert rebuttal reports. *See* F.R.C.P. 26(a)(2)(D)(ii). The Rule defines expert rebuttal evidence as that "intended solely to contradict or rebut evidence on the same subject matter" identified by another party. *Id*. Courts

interpreting the Rule's reference to the "same subject matter" "have done so broadly, requiring that a rebuttal report simply address the same topic as the affirmative report, as opposed to the same topic and methodology the affirmative expert relied on." *Federal Trade Commission v. Innovative Designs, Inc.*, 2018 WL 3611510 at *3 (W.D. Pa. July 27, 2018). "Courts have consequently allowed rebuttal reports that 'cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert.'" *National Medical Imaging, LLC v. U.S. Bank N.A.*, 2019 WL 9809616 at *2 (E.D. Pa. January 31, 2019) (citation omitted). However, a rebuttal report containing new opinions or information may not contradict the rebuttal expert's original report. *See Fulton Financial Advisors v. Natcity Investments, Inc.*, 2016 WL 5461897 at *2 (E.D. Pa. September 28, 2016). The Court "has wide discretion in determining what evidence may be presented on rebuttal." *FTC v. Innovative Designs, Inc.*, 2018 WL 3611510 at *2, citing *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974). "[T]here is no 'bright line rule that every opinion by an expert must be preliminarily stated in [his initial] report, or forever be precluded.'" *National Medical Imaging*, 2019 WL 9809616 at *3, quoting *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir. 2006).

a.    **The Hon. Marietta S. Robinson's Report is Proper Rebuttal.**

Defendant Kids2 argues that the Hon. Marietta S. Robinson's rebuttal report should be stricken in its entirety because a regulatory expert should have been presented in plaintiffs' case-in-chief. This argument should be rejected. Plaintiffs' *prima facie* case did not require the testimony of a regulatory expert, nor were plaintiffs obligated to produce one based on the possibility that defendant would do so.

Although plaintiffs did not identify a regulatory expert in their initial expert disclosures, defendant Kids2 elected to produce the report of regulatory expert Joseph P. Mohorovic, C.P.S.M.

*See* Mohorovic Report attached as Exhibit "I." In his report, Mr. Mohorovic provides information and opinions on topics including "Background of Product Safety in America," "What is the CPSC?"[2], "Voluntary Standards and Mandatory Rules, Regulations, Standards and Bans," "Danny Keyser Child Product Safety Notification Act," "Infant Bouncer Seats and ASTM International," "Promulgation of the Infant Bouncer Seat Standard as a Mandatory Regulation," "2017 Final Rule: Safety Standard for Infant Bouncer Seats," "2019 Update of ASTM F2167 and CPSC Incorporation by Reference," "European Standard EN 12790 for Child Use and Care Articles – Reclined Cradles," "Incidents Associated with Bouncer Seats," "The Subject Bouncer Seat is not Functionally Equivalent to an Inclined Sleeper," and "CPSC Expressly Precluded Bouncers from the Infant Sleep Products Rule." Mohorovic Report at Exhibit "I." He then sets forth five "Conclusions," including that (1) the subject product's "on-product warnings" complied with the standard of care, (2) the CPSC has found no evidence of a hazard pattern of "chin-to-chest positional asphyxia risk," (3) the "Kids2 Ingenuity SmartBounce Automatic Bouncer seat is not functionally equivalent to inclined sleep products," (4) the "AAP [American Academy of Pediatrics] does not discourage the intended use of bouncer seats," and (5) "Bouncer seats are, by definition, reclined, and are within a group of infant products likely to be used for infants who will fall asleep within the product … but are not intended for periods of unattended, routine sleep. Still, the CPSC codified the mandatory standard that governs bouncer seats in 2017 and recodified as recently as 2022." *Id*. at p. 24.

In her rebuttal report, the Hon. Marietta S. Robinson addresses the regulatory information and conclusions raised by Mr. Mohorovic. She aptly titles her report, "Hon. Marietta S. Robinson Rebuttal to Joseph Mohorovic Report," states that she was "asked to serve as a rebuttal expert to

---

[2] The Consumer Product Safety Commission is referred to as the "CPSC" herein.

respond to the defense expert report submitted by Joseph Mohorovic," and gives an introductory summary of the flaws in his viewpoints. *See* January 22, 2023 Rebuttal Report of the Hon. Marietta S. Robinson attached as Exhibit "J," at 1-2. Judge Robinson then sets forth information and opinions challenging those of Mr. Mohorovic, addressing topics that correspond to those in his report, including the history and powers of the CPSC, the Danny Keyser Child Product Safety Notification Act, ASTM, and the regulatory history and findings related to inclined sleepers and bouncers. *Id*. at 4-21. Judge Robinson not only references Mr. Mohorovic's opinions multiple times, she concludes her report with additional "Specific Responses to the Opinions of Joseph Mohorovic." *Id*. at 1, 2, 4, 14, 29-36.

Defendant Kids2 argues that *In re Air Crash Disaster*, 86 F.3d 498 (6th Cir. 1996), stands for the proposition that labeling Judge Robinson's report as rebuttal does not make it so. However, *In re Air Crash Disaster* does not apply here. In that case, the defendant airline, Northwest, wanted to present expert testimony that the co-defendant plane manufacturer, McDonnell Douglas, had violated FAA regulations. *In re Air Crash Disaster*, 86 F.3d 498 at 528. Northwest was restricted from using its own experts to do so because of a ruling that precluded experts from expressing opinions not yet formed at the time of their deposition. *Id*. Multiple plaintiffs had settled out, and Northwest wanted to use their experts to make the point. *Id*. However, the parties had agreed that the settling plaintiffs' experts could only be offered on rebuttal issues. *Id*. The court concluded that Northwest could not circumvent that agreement "by sticking the label 'rebuttal' on a neglected part of its affirmative case," noting that "[r]ebuttal testimony is responsive to new information by the other party." *Id*. Here, plaintiffs are not "relying on a label" by disclosing Judge Robinson's timely rebuttal report – she is a bona fide rebuttal expert responding to new information in the form of defendant's decision to insert a regulatory expert into this case.

21

Defendant Kids2 also argues that Judge Robinson's report is not rebuttal because she offers an "indictment of the CPSC" and "discusses inclined sleep products," including those manufactured by Fisher-Price.  However, Judge Robinson's opinions on the CPSC are in rebuttal to Mr. Mohorovic's portrayal of the CPSC and its regulation of bouncer products in support of his opinions in this case.  The same is true of her discussion of inclined sleeper products – Mr. Mohorovic discusses inclined sleeper products and opines that "[t]he Kids2 Ingenuity SmartBounce Automatic Bouncer seat is not functionally equivalent to inclined sleep products." Mohorovic Report at Exhibit "I," 20, 23, 24.  He also references Fisher-Price as being on the same ASTM subcommittee as Kids2.  *Id*. at 12.

Kids2 further argues that Judge Robinson's opinions on notice are not rebuttal because notice was not addressed by Mr. Mohorovic.  That is not accurate.  Mr. Mohorovic opined on notice from a regulatory perspective in his conclusion that the CPSC found no evidence of a hazard pattern of chin-to-chest asphyxia related to bouncer seats.  *See* Mohorovic Report at Exhibit "I," 24.  He also opined on whether notice of safety issues involving inclined sleeper products translates to bouncers in his conclusion that the bouncer is not functionally equivalent to inclined sleep products.  *Id*. at 23, 24.  Accordingly, plaintiffs' regulatory expert's opinions on notice are in rebuttal to those of Mr. Mohorovic.  As set forth above, rebuttal can "cite new evidence and data" so long it "is offered to directly contradict or rebut the opposing party's expert.'" *National Medical Imaging, LLC*, 2019 WL 9809616 at *2.

For all these reasons, plaintiffs respectfully request that defendant Kids2's Motion to Strike the expert report of the Hon. Marietta S. Robinson as improper rebuttal should be denied.

**b.      Wayne Ross, M.D.'s Rebuttal Report is Proper.**

Defendant Kids2 argues that forensic pathologist Wayne Ross, M.D. offers improper opinions in rebuttal and asks this Court to strike Dr. Ross's opinions regarding (1) his review of microscopic slides from the autopsy; and (2) that plaintiffs' child was positioned "in the bouncer, in a slouched position with head to the right" at the time of his death.  The Motion to Strike these opinions should be denied.

**i.      Microscopic Slide Opinions**

Defendant Kids2 argues that Dr. Ross's opinions related to his review of the microscopic slides from K.M.'s autopsy should be stricken from his rebuttal report because they should have been included in his initial report.  Dr. Ross had not yet received the slides from the Blair County Coroner' Office when he prepared his initial report.  However, he expressed opinions in his initial report that were based on the coroner's microscopic findings and testified about those opinions at his deposition.  Defendant's forensic pathology expert repeatedly referenced Dr. Ross's opinions related to the slides in her report.  Moreover, the defense experts also argued that there is no evidence of hypoxic ischemia that occurred while the baby was living.  Dr. Ross's rebuttal report, written after he received and reviewed the slides, properly rebuts these statements by the defense experts and supports the opinions he expressed in his initial report.

Dr. Ross's initial expert report does not include a review of the microscopic slides from the autopsy.  *See* Dr. Ross's October 6, 2022 report attached as Exhibit "K."  Although plaintiffs' prior counsel had obtained K.M.'s autopsy records, which include discussion of the coroner's examination of the microscopic slides, the actual slides were requested on November 14, 2022. *See* November 14, 2022 letter to ForensicDx attached as Exhibit "L."  Dr. Ross was deposed the next day.  He informed defense counsel at his deposition that he planned to obtain and review the

slides.  *See* November 15, 2022 Deposition of Wayne Ross, M.D., attached as Exhibit "M," at 9:16-18 ("I still have to review some microscopic slides.  I haven't done that yet.  They're coming."); 23:24-24:1 ("I need to see the microscopic slides. They're in the process of getting them.").  In fact, at one point, defense counsel stated, "I hear you on the microscopic slides."  *Id*. at 25:1-2.

Defendant Kids2 produced its expert reports on December 23, 2023, including the report of forensic pathologist Kimberly A. Collins, M.D.   Dr. Collins repeatedly referenced the microscopic slides in her report and Dr. Ross's opinions in connection with them, including as follows:

- Dr. Collins stated that bronchiolitis, adrenal calcifications, and petechiae on the lungs were identified in the autopsy, but that "the remainder of the gross and microscopic autopsy findings were negative."  *See* Dr. Collins' report attached as Exhibit "N" at 2.

- Dr. Collins opined that "had the neck of [K.M.] been 'bent like a straw' as hypothesized by Dr. Ross, it would be reasonable to expect to observe signs of pressure resistance microscopically and/or on imaging" and that "[n]o such signs exist in this case."  *Id*. at 5.

- Dr. Collins stated that Dr. Huddle [the coroner who performed the autopsy] "found no edema or froth in [K.M.'s] lungs under the microscope."  *Id*.

- Dr. Collins stated that "[w]hile Dr. Ross states that the examining pathologist's analysis of microscopic slides ruled out membrane disease and congenital malformation, this is disingenuous."  *Id*. at 6.

In addition, although Dr. Ross opines in his initial report that K.M. exhibited "classic signs of asphyxia" including hypoxic ischemic encephalopathy, defense expert Dr. Camacho disputes this opinion, stating that "brain hypoxia is a common feature of death" and that "[s]oon after death, global hypoxia and the process of cerebral autolysis ensue, resulting in decreases in differentiation between brain gray matter and white matter on postmortem CT, reflecting fluid accumulation and brain swelling."  December 22, 2022 report of Dr. Camacho attached as Exhibit "O" at 8.  Dr. Ross utilizes the slides to directly rebut those opinions.

Dr. Ross's January 23, 2023 rebuttal report sets forth ten short opinions.  *See* Dr. Ross's January 23, 2023 rebuttal report, attached as Exhibit "P."  First, he states that after his receipt and review of the slides, along with other materials, the opinions in his initial report "remain unchanged."  *Id*. at 1.  He then indicates that after reviewing the slides, "I concur, in general, with the findings of the autopsy forensic pathologist" and explains why.  *Id*.  Dr. Ross then rebuts the opinions of defense experts Camacho, Collins, and Prange and Sala.  *Id*. at 1-2.

Defendant Kids2 does not specify which of Dr. Ross's opinions should be stricken as related to his review of the slides.  However, every aspect of Dr. Ross's report is proper rebuttal – including of Dr. Collins' statements concerning his opinions based on the autopsy slides and of the position taken by Dr. Camacho regarding brain hypoxia – and properly include further related support for the opinions in his initial report.  As stated above, a rebuttal expert's report cannot reach different conclusions than those set forth in his initial report, but it can cite new evidence and data in support of his initial positions, so long as they contradict or rebut an opposing party's expert.  *See Federal Trade Commission*, 2018 WL 3611510 at *3; *National Medical Imaging*, 2019 WL 9809616 at *2.

For all these reasons, plaintiffs respectfully request that this Court deny defendant Kids2's Motion to Strike the opinions in Dr. Ross's rebuttal report related to his review of the microscopic slides from K.M.'s autopsy.

## ii.    The Child's Position

This Court should also reject defendant Kids2's argument that Dr. Ross's opinion that plaintiffs' child was positioned "in the bouncer, in a slouched position with head to the right" at the time of his death is improper rebuttal.  Kids2 calls this opinion "brand-new" and therefore improper for a rebuttal report.  Kids2 is wrong.  This opinion was in Dr. Ross's initial expert report

and was fleshed out in no uncertain terms at his deposition.  Kids2's Motion to Strike should therefore be denied.

In his initial expert report, Dr. Ross opined that K.M. died from positional asphyxia when, although originally lying face up in the bouncer, gravitational forces and the angle of the product caused his head to flex into his chest and his neck to bend "like a straw," resulting in his airway becoming obstructed.  *See* Dr. Ross's October 6, 2022 report at Exhibit "K," 2, 4, 5.  Dr. Ross associated the location of K.M.'s head to blood from his nose found on the right side of the bouncer.  *Id*.

At his deposition, Dr. Ross further explained K.M.'s positioning, describing it as slouched down in the area of the blood stain.  He testified that the blood on the bouncer could be close to where K.M.'s nose was "if he were slouched down in that area" and that "the only reasonable conclusion has to be that the child slouched down due to gravitational forces and the inclination angle …. ."  *See* November 15, 2022 Deposition of Wayne Ross, M.D., attached as Exhibit "M," at 35:7-19; 93:21-94:2.  He further testified that "[i]t's my opinion that because of the inclination angle and -- of this product, combined with the fact that there's no firm foundation in this product … allow for gravitational forces to function much more effectively and cause him to slouch down and then cause the head and neck complex to go forward," and that "you're looking at the whole body is pulled downward, right. The whole body is pulled down. Gravity pulls you downward. The forces will pull you downward. It's exerted on the entire body, but the -- because of the flexibility of the underlying cloth, instead of being a firm sort of foundation, it's more of a cloth foundation. It gives way and allows the child to kind of slouch and slide down."  *Id*. at 94:8-15, 124:10-17.

In the expert reports produced by defendant Kids2 on December 23, 2023, human factors expert Joseph Sala, Ph.D. and biomechanical engineering expert Michael T. Prange, Ph.D., M.E. took issue with Dr. Ross's opinion that K.M. slouched down in the bouncer, calling it "unsupported and without basis." December 22, 2022 report by Prange and Sala of Exponent attached as Exhibit "Q" at 33. They also disputed Dr. Ross's opinion that K.M.'s head fell to the right, toward the blood stain on the bouncer. *Id*. at 32-33. Dr. Ross addressed their opinions in his rebuttal report by referencing the findings of plaintiffs' biomechanical engineering expert, Erin Mannen, PhD, and the testimony of Deputy Coroner Katelyn Taylor, who stated that the plaintiff-mother told her that when she found K.M., his head was turned to the right. *See* Dr. Ross's January 23, 2023 rebuttal report at Exhibit "P," 2. He then reiterated that "the location of the bloodstain is consistent with [K.M.] being in the bouncer, in a slouched position with his head to the right." *Id*. at 2-3.

Dr. Ross's statement in his rebuttal report that K.M. was in a slouched position with his head to the right is not a new opinion. It was in his initial expert report and deposition testimony. It was addressed in by defendant's experts. It was supported and restated by Dr. Ross in rebuttal. For these reasons, defendant Kids2's Motion to Strike Dr. Ross's rebuttal opinion that K.M. was positioned "in the bouncer, in a slouched position with head to the right" at the time of his death should be denied.

### c.   Dr. Mannen's Rebuttal Opinion Regarding the Swing Manual is Proper.

Defendant Kids2 also argues that this Court should strike the rebuttal opinions of plaintiffs' biomechanical engineering expert, Erin M. Mannen, Ph.D., regarding the Kids2 AnyWay Sway™ PowerAdapt™ Dual-Direction Swing ("the Swing") product manual. Kids2 characterizes these opinions as improper rebuttal that raising novel evidence from a different product to support Dr.

Mannen's initial opinions, but that do not rebut any opinions expressed by Kids2 experts. These arguments should be rejected.

In her initial expert report, Dr. Mannen opines that the chin-to-chest position can create difficulty breathing, citing a 1994 paper by Reiterer, "Influence of head-neck posture on airflow and pulmonary mechanics in preterm neonates." October 4, 2022 Biomechanical Engineering Report of Erin M. Mannen, Ph.D., attached as Exhibit "R," at 3, 9, 15, 18, 19, 22. Defendant's pediatric neonatology expert, Jay P. Goldsmith, M.D., disputed Dr. Mannen's opinion and her reliance on the Reiterer article. *See* December 23, 2022 Report of Jay P. Goldsmith, M.D. attached as Exhibit "S" at 23-24. Dr. Goldsmith called the Reiterer paper "totally inapplicable" because it studied premature, not term, infants. *Id*.

Dr. Mannen rebutted Dr. Goldsmith's criticism of her opinion and her reliance on Reiterer. *See* Dr. Mannen's January 20, 2023 rebuttal report attached as Exhibit "T" at 4. She noted that "defendants offer no peer-reviewed evidence refuting the point or proving that a >30° head/neck flexion angle is indeed safe," and stated that "it is appropriate to extrapolate the findings from Reiterer, 1994, to this case." *Id*. Dr. Mannen also pointed out that the chin-to-chest position "is well-known to create airway obstruction and therefore breathing difficulties" and that "defendants even admit to this fact" in [the Swing] product manual, which states that "[y]oung infants have limited head and neck control. If the seat is too upright, infant's head can drop forward and compress airway." *Id*. Thus, Dr. Mannen was not introducing new evidence on a technical point concerning the Swing. She was rebutting Dr. Goldstein by pointing out that, while he may argue that Reiterer does not support her opinion on the danger of the chin-to-chest position, Kids2 has acknowledged that the danger exists.

Defendant cites *Avco Corporation v. Turn and Bank Holdings, Inc.*, 2017 WL 2224915 (M.D. Pa. May 22, 2017), for the proposition that rebuttal reports can cite new evidence only if it is offered to contradict or rebut the opposing party's expert.  As detailed above, that is exactly what Dr. Mannen did in her rebuttal report when she referenced the content of the Swing manual. Moreover, the Motion to Strike rebuttal testimony at issue in *Avco* was denied.

For these reasons, defendant Kids2's Motion to Strike Dr. Mannen's rebuttal related to the Kids2 AnyWay Sway™ PowerAdapt™ Dual-Direction Swing's manual should be denied.

### d. Dr. Rosen's Rebuttal Opinions Regarding the Swing Manual and Kids2's Awareness of Inclined-Sleep Dangers Are Proper.

Defendant Kids2 also wants to strike the rebuttal opinions of plaintiffs' pediatric pulmonology expert Dennis Rosen, M.D. related to the Kids2 Swing Manual and Kids2's awareness of inclined-sleep risks.  As in its arguments to strike Dr. Mannen's rebuttal related to the Swing Manual, Kids2 argues that Dr. Rosen is improperly offering an opinion on a different product that does not rebut Kids2's experts.  These arguments should be rejected.

In his initial expert report, Dr. Rosen opines that "the Kids2 Ingenuity Smart Bounce Automatic Bouncer Moreland places an infant in an anatomical position which is unsafe for unsupervised sleep of any duration. The inclined surface of 35 degrees, with no firm backing, positions an infant in a manner that predisposes them to neck flexion (bending the neck forward) and to falling into a chin to chest position, which can then displace the jaw and tongue backwards and upwards, narrowing and even blocking completely the upper airway passages of the back of the mouth and throat." *See* September 26, 2022 report of Dennis Rosen, M.D. attached as Exhibit "U" at 19.  Dr. Rosen also stated in his initial report that "the use of such a device for infant sleep puts infants at increased and unnecessary risk of positional asphyxia, suffocation, and death," and

that K.M. "fell into the chin-to-chest position, developed positional obstruction of his upper airway passages, was unable to extricate himself from this position, asphyxiated," and died. *Id*.

Defense experts Prange and Sala challenged Dr. Rosen's opinions in their report, stating, *inter alia*, that "Dr. Rosen has not demonstrated and has no basis to conclude the subject product would create such a hazardous position" and that "no studies have identified positional asphyxia when measuring similar degrees of head flexion." December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q" 29, 30. As part of his rebuttal of this statement, Dr. Rosen referred to the Kids2 Swing product manual warning: "SUFFOCATION HAZARD: Young infants have limited head and neck control. If the seat is too upright, infant's head can drop forward and compress the airway," and stated that it demonstrated Kids2's awareness of the danger. *See* January 20, 2023 rebuttal report of Dr. Rosen attached as Exhibit "V" at 3.

As was the case with Dr. Mannen, Dr. Rosen did not introduce new evidence on a technical point concerning the Swing. He was rebutting Prange and Sala by pointing out that, although they state that no studies have identified positional asphyxia in the context of similar degrees of head flexion, Kids2 itself has acknowledged that the danger exists.

For these reasons, defendant Kids2's Motion to Strike Dr. Rosen's rebuttal related to the Kids2 AnyWay Sway™ PowerAdapt™ Dual-Direction Swing's manual and Kids2's knowledge of the danger identified therein should be denied.

### e. Defendant's Motion to Strike Dr. Glancey's Rebuttal Opinions Should Be Denied.

Defendant Kids2 asks this Court to strike the rebuttal report of plaintiffs' engineering expert, James Glancey, PhD, P.E. in no less than twelve respects. Each of them should be rejected.

Defendant Kids2 argues that Dr. Glancey's rebuttal opinions relying on the deposition testimony of corporate designee Andrew Farhat should be stricken because Dr. Glancey did not

review Mr. Farhat's deposition testimony prior to being deposed.  This argument should be denied because it is incorrect – Dr. Glancey stated at his deposition that he had reviewed Mr. Farhat's testimony.  *See* Excerpts from Deposition of James Glancey, PhD, P.E. attached as Exhibit "W" at 256:24-258:7 (stating with respect to Kids2's Quality Review Board ("QRB") process that "it's kind of a phase quality review kind of program, as I understand it.  And as was described by Mr. Fairhat [sic], I believe.); 260:5-24 (discussing Mr. Farhat's deposition testimony); 293:14-19 (referencing Mr. Farhat's qualifications).  Despite his multiple references to it, defense counsel did not ask Dr. Glancey how Mr. Farhat's testimony supported or disproved the opinions in his initial report.

Dr. Glancey also properly relies on Mr. Farhat's deposition testimony in his rebuttal report.  In his initial report, Dr. Glancey expressed opinions including the defective nature of the Kids2 bouncer and Kids2's failure to employ engineering failure analysis tools that would have identified and remedied the product's defects.  *See* Dr. Glancey's October 5, 2022 report attached as Exhibit "X."  The bases for his opinions included inspection of the subject bouncer and its manual, experience inspecting similar Kids2 products, examination of the hazards associated with inclined sleepers, and engineering analysis of the methodologies available to Kids2 to identify and design out the hazard inherent in the bouncer's design.  *Id.*  Defense experts Prange and Sala criticized Dr. Glancey's opinions in their report, including stating that he "failed to mention that the subject Bouncer is not intended for sleep," that Kids2 engaged "in a multi-step QRB process" for the bouncer, and that no literature or studies "indicated that the subject product or product category put infants at risk of a hazardous chin-to-chest position."  *See* December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q," 35-38, 46.  Prange and Sala also referred to Mr. Farhat's

deposition testimony, including that he testified that Kids2 engaged in a QRB process and considered the risk of positional asphyxia by testing to the ASTM standard. *Id*. at 15-16.

In his rebuttal report, Dr. Glancey addresses the opinions of Prange and Sala, including by reference to Mr. Farhat's deposition testimony. *See* Dr. Glancey's January 23, 2023 rebuttal report attached as Exhibit "Y."  Dr. Glancey states, *inter alia*, that the QRB process described by Mr. Farhat lacked any written criteria, and that Mr. Farhat confirmed that Kids2 tested the bouncer for ASTM compliance in China and did not perform any additional testing, that it was harder for babies to keep their airways straight when on an incline, and that the incline of the subject bouncer was higher than that of a recalled Kids2 sleeper product. *Id*. at 7, 10-11, 13-14.  The opinions in his rebuttal report are the same as those offered in his initial report, and he states that "[t]he results from the Defense experts are not compelling or scientifically justified, and therefore do not change or modify any of my opinions offered in my First Report." *Id*. at 15.  Dr. Glancey's rebuttal opinions are also consistent with the references he made at his deposition to Mr. Farhat's testimony, which included commentary on the Kids2 QRB process, and which defense counsel chose not to develop.  *See* Excerpts from Deposition of Dr. Glancey at Exhibit "W," 256:24-257:13, 260:5-24, and 293:14-19.  Accordingly, Dr. Glancey's rebuttal opinions regarding the deposition testimony of Mr. Farhat are proper and should not be stricken.[3]

Defendant Kids2 also argues that Dr. Glancey is foreclosed from offering rebuttal opinions based on product design records that plaintiffs' prior counsel did not provide him with prior to his initial report.  Specifically, Kids2 seeks to strike "novel design opinions" set forth at paragraphs

---

[3] Defendant Kids2's Motion to Strike asks the Court to strike Section IV of Dr. Glancey's rebuttal report, which Kids2 describes as pertaining to the deposition of Mr. Farhat.  However, Section IV of Dr. Glancey's rebuttal report pertains to defense regulatory expert Joseph P. Mohorovic, C.P.S.M., not to Mr. Farhat.  It is Section V of Dr. Glancey's rebuttal report that pertains to Mr. Farhat.  Kids2's reference to Section IV in the instant Motion is therefore believed to be in error and will not be addressed herein.

5, 6, 9, 11, 12, 13, 18, and 19 of Dr. Glancey's rebuttal report.  However, these opinions are not

novel and are proper rebuttal to the defense experts' opinions and their critique of Dr. Glancey's

initial report.

As stated above, Dr. Glancey opined in his initial report that the bouncer was defectively

designed, that Kids2 failed to employ proper engineering analysis tools to identify and remedy its

defects, and that the basis for his opinions included his inspection of the subject product and review

of the product manual.  *See* Dr. Glancey's October 5, 2022 report attached as Exhibit "X."  Defense

experts Prange and Sala counter in their report that he is incorrect on these points.  *See* December

22, 2022 report by Prange and Sala of Exponent at Exhibit "Q."   Kids2 does not specify what

design documents it believes led to the "novel" rebuttal opinions it wants stricken.  However,

review of Dr. Glancey's reports and deposition, and the report of Prange and Sala, reveals that the

opinions are not novel in the least, and are proper rebuttal, as follows:

- **Paragraph 5** - Kids2 argues that Dr. Glancey's opinion that the bouncer is "substantially similar" to other Kids2 products is not in his original report and not rebuttal to Kids2's experts. This is incorrect.  Dr. Glancey stated in his initial report that he inspected similar Kids2 products, and at his deposition that bouncers are substantially similar to inclined sleepers.  *See* Dr. Glancey's October 5, 2022 report at Exhibit "X," 12-13, 21 (¶¶ 34-35, 56); Excerpts, Depo. J. Glancey at Exhibit "W" 113:8-17, 117:12-14, 123:10-15.  In response to Dr. Glancey, Prange and Sala emphasize that the bouncer is not a sleeper.  *See* December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q," 35-36, 46.

- **Paragraph 6** – Kids2 argues that Dr. Glancey should not be permitted to cite a CPSC supplemental notice of proposed rulemaking because the citation was not in his initial report and does not rebut Kids2's experts.  Dr. Glancey cited the notice in support of the proposition that the CPSC was advocating a maximum seat angle of 10 degrees or less for products that allow for or were design specifically for infant sleep.  His initial report addressed incline angles.  *See* Dr. Glancey's October 5, 2022 report at Exhibit "X," 9-10 (¶¶ 30, 31), and Prange and Sala make multiple statements about seat angle.  *See* December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q," 13-14, 37.  Citation to an additional source in support of his opinion on seat angles, in response to defendant's experts, was permissible rebuttal on the part of Dr. Glancey.

- **Paragraph 9** - Kids2 argues that Dr. Glancey presents a novel opinion in his rebuttal report because, although his initial report stated that a sleeping surface should be angled at 10

degrees or less, his rebuttal report stated that around 10 degrees was unsafe due to margin of error.  Prange and Sala state that "[t]he head flexion angle with the infant in the Bouncer was measured to be approximately 10 degrees."  *See* December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q," 14.  In his rebuttal report, Dr. Glancey referenced the 10 degree standard and stated that the "approximate" Prange and Sala result, based on a single measurement, was dangerously close to the limit due to the possible margin of error in their measurement.  He does not contradict or change his prior opinion and his statement is in rebuttal to the defense expert report.

- **Paragraphs 11 and 12** – Kids2 argues that in these paragraphs, Dr. Glancey opines on design documents that he did not opine on in his original report.  Dr. Glancey rebuts Prange and Sala's opinions on Kids2's QRB process in these paragraphs.  While it is true that he did not have the Kids2 QRB documents when preparing his initial report, he opined on the inadequacy of Kids2's failure to employ engineering failure analysis tools in his report and spoke to the issue at his deposition.  *See* Dr. Glancey's October 5, 2022 report at Exhibit "X"; Excerpts, Depo. J. Glancey at Exhibit "W," 256:24-258:7.  These paragraphs of Dr. Glancey's rebuttal report, written after he received and reviewed the Kids2 QRB documents, properly rebut the defense experts and reinforce the opinion expressed in his initial report and deposition.  Again, a rebuttal expert's report cannot reach different conclusions than those set forth in his initial report, but it can cite new evidence and data in support of his initial positions, so long as they contradict or rebut an opposing party's expert.  *See Federal Trade Commission*, 2018 WL 3611510 at *3; *National Medical Imaging*, 2019 WL 9809616 at *2.

- **Paragraph 13** – Kids2 argues that in this paragraph, Dr. Glancey offers an opinion on acceptable design processes for engineers that was not in his original report and is not rebuttal to Kids2's experts.  Dr. Glancey's initial report addressed design processes for engineers.  *See* Dr. Glancey's October 5, 2022 report at Exhibit "X," "IX.  Engineering Analysis" and p. 23 ¶ 61.  Prange and Sala rebutted him on the issue.  *See* December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q," 36.  Accordingly, Dr. Glancey's further discussion of the issue in paragraph 13 of his rebuttal report, in which he cites an additional article while reaching the same conclusion that he did in his initial report, was proper.

- **Paragraph 18** – Kids2 argues that Dr. Glancey's opinion in this paragraph that sleeping in the bouncer was reasonably foreseeable given the bouncer's warnings was not in his original report and is not rebuttal to Kids2's experts.  This is incorrect.  Dr. Glancey does opine on this issue in his initial report.  *See* Dr. Glancey's October 5, 2022 report at Exhibit "X," 10-11, 23 (¶¶ 32, 60).  Prange and Sala disagreed with this opinion in their report, stating that "[t]o the extent that [K.M.] was placed inside of the Bouncer for the express purpose to sleep, and as stated for prolonged and overnight sleep, the safety information clearly warns against and states this to be an inappropriate use of the product.  Had the existing warning and information been followed, the subject Bouncer would not have been used in the manner alleged in the current incident."  *See* December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q," 42.  Accordingly, Dr. Glancey's further discussion of the issue in paragraph 18 of his rebuttal report was proper.

- **Paragraph 19** – Kids2 argues that Dr. Glancey's citation in this paragraph to a manual to opine about the beneficial outcomes from FMEA's on product safety should be stricken because the citation was not in his original report and is not rebuttal to Kids2's experts. In this paragraph, Dr. Glancey is rebutting the statement by Prange and that he did not provide any evidence that a Design Failure Mode and Effect Analysis ("DFMEA") would have prompted a design change. Dr. Glancey first refers to literature that he cited in his initial report. He also points out that several other books and standards support his position, citing to *The Potential Failure Modes and Effects Manual* as an example. As discussed above, it was proper for Dr. Glancey to refer to additional literature in support of his opinions in order to rebut the statement by defendant's expert challenging whether any such support exists.

- **Paragraph 19** – Kids2 also argues that Dr. Glancey's statement in this paragraph that Kids2 should have been motivated to ensure that its product was as safe as possible is improper rebuttal because he did not give such an opinion in his initial report. However, Dr. Glancey made this rebuttal statement with respect to the opinion expressed in his initial report that Kids2 failed to implement engineering failure analysis tools that would have identified and remedied the product's defects. That opinion was disputed by Prange and Sala, and the statement by Dr. Glancey in rebuttal report, was proper.

- **Paragraph 19** – Kids2 further argues with respect to paragraph 19 that, because the opinion was not in his original report or those of Kids2's experts, Dr. Glancey should not be permitted to opine on correspondence between Kids2 and CPSC revealing that Kids2 knew of the death of a 2-month-old infant while in a Kids2 bouncer. However, Dr. Glancey opined in his initial report that the bouncer was defective and unsafe. He also testified at deposition that he believed the bouncer could cause death. *See* Excerpts, Depo. J. Glancey at Exhibit "W," 284:1-4. Prange and Sala challenged this position, and it is proper rebuttal for Dr. Glancey to refer to additional documents in support of his opinions.

"[M]erely calling material 'new' and describing it as 'an attempt to provide details that should have been incorporated into [the expert's] initial report' is an insufficient to strike a rebuttal report. *Vrakas v. United States Steel Corporation*, 2019 WL 7372041 at *12 (W.D. Pa. December 31, 2019). "[E]xpert rebuttal reports should not be stricken if they contain 'an elaboration of' the initial report, and when the rebuttal is 'consistent with an opinion/issue previously addressed' in the initial report." *Id.*, citing *Prichard v. Dow Agro Sciences*, 263 F.R.D. 277, 284-85 (W.D. Pa. 2009). For these reasons, and as further set forth above, Kids2's Motion to Strike Dr. Glancey's opinions in paragraphs 5, 6, 9, 11, 12, 13, 18, and 19 of his rebuttal report should be denied.

Finally, defendant Kids2 argues that Dr. Glancey's rebuttal opinions relying on the deposition testimony of Deputy Coroner Katelyn Taylor should be stricken.  This argument should be rejected.  In preparing his initial report, Dr. Glancy reviewed Deputy Coroner Taylor's report.  *See* Dr. Glancey's October 5, 2022 Report attached as Exhibit "X," 1, 7 (¶¶ 23, 26).  Thus, her observations were part of the basis for the opinions in his initial report, including her observations that K.M. was reported by his mother to have been sleeping in the bouncer the morning of the incident, and that this information correlated with the small amount of blood found in the bouncer.  *Id*.  Dr. Glancey also discussed his reliance on Deputy Coroner Taylor's report at his deposition.  *See* Excerpts, Depo. J. Glancey at Exhibit "W," 204:6-21, 217:20-218:4.  Defense experts Prange and Sala discussed the content of Deputy Coroner Taylor's report with an eye toward discrediting any conclusion that K.M. was in the bouncer when he died.  *See* December 22, 2022 report by Prange and Sala of Exponent at Exhibit "Q," 2-4.  Thus, it was proper for Dr. Glancey to review Deputy Coroner Taylor's deposition transcript in connection with the preparation of his rebuttal report.  Kids2 does not identify the rebuttal opinions it claims arose from Dr. Glancey's review of Deputy Coroner Taylor's deposition, and their Motion to Strike any reliance on the deposition in the preparation of his rebuttal report should be denied.

For all of the reasons set forth above, it is respectfully requested that defendant Kids2's Motion to Strike the rebuttal reports of plaintiffs' experts should be denied.

### 3.     The Reports of Plaintiffs' Rebuttal Experts Should Not Be Stricken.

As set forth above, defendant Kids2's Motion to Strike should be denied because plaintiffs' experts offered proper rebuttal opinions. However, should this Court conclude that one or more of the expert's opinions do not fall within the scope of rebuttal, the opinions should not be stricken.

Rather, for the reasons set forth below, and at this Court's discretion, an order permitting the expert's deposition to be reconducted should be entered.

"The imposition of sanctions for abuse of discovery under [Rule 37] is a matter within the discretion of the trial court." *Hurd v. Yaeger*, 2009 WL 2516934 at *3 (M.D. Pa. August 13, 2009) (citations omitted). *See also* F.R.C.P. 37(c)(1). A trial court has discretion to exclude expert testimony where counsel fails to adhere to a pretrial order. *Holbrook v. Woodham*, 2008 WL 544719 at *2 (W.D. Pa. February 28, 2008). When a party fails to identify an expert as required by Rule 26(a) or (e), the court may order that the party is not allowed to use the witness at trial, unless the failure was substantially justified or is harmless. F.R.C.P. 37(c)(1). *See also Pritchard*, 263 F.R.D. 277, 282 (W.D. Pa. 2009); *Holbrook*, 2008 WL 544719 at *2.

In determining whether exclusion of evidence is warranted, "the Court should consider the five *Pennypack* factors: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence." *Sikkelee v. Precision Airmotive Corporation*, 2021 WL 392101 at *3-*4 (M.D. Pa. February 4, 2021), citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir. 1977) (quotations omitted). "The importance of the evidence is often the most significant factor." *Id*. at *4 (citation omitted). Exclusion of critical expert evidence is an "extreme sanction" warranted only where there is "willful deception" or "flagrant disregard" of a court order by the proponent of the evidence. *Gagnon*, 2008 WL 5061684 at *1; *see also Hurd*, 2009 WL 2516934 at *3 (same).

The *Pennypack* factors weigh in favor of denying defendant's Motion to Strike plaintiffs' expert rebuttal reports here.  The evidence at issue is extremely important because expert testimony is a critical component of plaintiffs' case in this complex product liability matter, in which they have the burden of proof.  Thus, plaintiffs would be severely prejudiced should they be barred from presenting the expert testimony at issue.  Allowing the evidence to be admitted would cause no prejudice to defendant, who can reconduct the depositions of plaintiffs' experts.  *See Holbrook*, 2008 WL 544719 at *2 (extension of expert discovery deadline to permit expert's deposition will cure any prejudice to opposing party of late identification of witness); *Sikkelee v. Precision Airmotive Corporation*, 2021 WL 392101 at *9 (M.D. Pa. February 4, 2021) (no appearance of prejudice where party waited two months to file motion to strike).  Any related depositions can be accomplished without disrupting the trial date, which is September of 2023.  Finally, plaintiffs' conduct in failing to produce the expert opinions at issue by the court ordered deadline does not amount to the flagrant disregard or egregious bad faith that has compelled the courts of this district to exclude expert testimony.  *See e.g. Holbrook*, 2008 WL 544719 at *3 (party's awareness and willful disregard of deadline for expert disclosure not sufficiently egregious to satisfy standard).

The instant case raises issues similar to those decided in *Gagnon,* where the court denied plaintiffs' motion *in limine* to exclude the defendant's expert report, submitted 16 months after the expert deadline, finding that the prejudice in admitting the report was minimal because several months remained before trial.  It is also similar to *Bush v. Hulmes*, 2018 WL 3428161 (E.D. Pa. Jan. 11, 2018), where, although the court's scheduling order required plaintiff to serve expert reports by September 15, 2017, plaintiff produced the report of an expert psychologist on November 15, 2017, the last day of all discovery.  *Bush*, 2018 WL 3428161 at *1.  The court in *Bush* denied the defendant's motion to strike plaintiff's expert report, noting that plaintiff's case

should not suffer because of the inadvertent but negligent omission of his counsel. *Id.* The court also found that the delay was not prejudicial to the defendant. *Id*.

Counsel acknowledges that any late disclosure of the expert opinions at issue was the result of a mistake made by plaintiffs' prior counsel, and was not the fault of plaintiffs, Tanya McCartney and Mark Montgomery III, or the fault of defendants, and that plaintiffs' counsel was and is at all times responsible for complying with court ordered deadlines. As in *Bush*, it is respectfully requested that instantly, and as further set forth above in response to defendant's Motion for Sanctions, plaintiffs' case should not suffer because of the conduct of counsel.

In *Avco Corporation v. Turn and Bank Holdings, Inc.*, 2017 WL 2224915 (M.D. Pa. May 22, 2017), cited by defendant, the court denied the pending Motions to Strike, concluding that they were proper rebuttal, and that exclusion would not have been called for under the *Pennypack* factors even if that conclusion had not been reached. The court observed in *Avco* that "[j]ustice for the parties, and not necessarily vindication of the attorneys, demands that this case move toward a fair adjudication on the merits." *Avco*, 2017 WL 2224915 at *1. Here, as in *Avco*, defendant Kids2's Motion to Strike plaintiffs' rebuttal reports should be denied, and the case permitted to move forward on its merits.

III.    CONCLUSION

For all of the reasons set forth above, plaintiffs respectfully request that this Honorable

Court deny Defendant Kids2's Motions for Sanctions and to Strike Rebuttal Testimony.


                              Respectfully submitted,

                              **KLINE & SPECTER, P.C.**

            By:   _____

                              Shanin Specter, Esquire


                              _____

                              Michael A. Trunk, Esquire
Date:  February 15, 2023      *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiffs' Omnibus Brief in Opposition to Defendant Kids2, Inc.'s Motions For Sanctions and to Strike Rebuttal Testimony by filing the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

                                        **KLINE & SPECTER, P.C.**

                    By:   _____
                                        Shanin Specter, Esquire

                          _____
                                        Michael A. Trunk, Esquire
Date:  February 15, 2023                *Attorneys for Plaintiffs*